**STATE of Minnesota, Respondent,**

v.

**Charles D. SMITH, Appellant.**

**No. C7–84–795.**

Supreme Court of Minnesota.

May 3, 1985.

C. Paul Jones, Public Defender, Michael F. Cromett, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas J. Johnson, Hennepin County Atty., Vernon E. Bergstrom, Michael Richardson, Beverly J. Wolfe, Paul R. Jennings, Anne E. Peek, Asst. County Attys., Minneapolis, for respondent.

COYNE, Justice.

Defendant was found guilty by a district court jury of first-degree premeditated murder, Minn.Stat. § 609.185(1) (1982), and first-degree intentional murder in the commission of aggravated robbery, section 609.185(3), and he was sentenced by the trial court to a mandatory term of life in prison. On appeal, he claims (1) that the

state failed to prove that he killed the victim or that he did so either with premeditation or with intent during the commission of an aggravated robbery, and (2) that he was denied a fair trial by (a) the prosecutor's violation of the discovery rules, (b) the trial court's denial of his pretrial request for a continuance, (c) the court's denial of his pretrial motion to suppress evidence that he contends was the fruit of a violation of the Minnesota Government Data Practices Act, and (d) the court's admission of other-crime evidence. We affirm.

The victim was Allen Olson, a 40-year-old architect. Olson, a homosexual, shared a house in Southeast Minneapolis with another man. Olson's body was discovered by the roommate late on July 4, 1983, when the roommate returned from a weekend trip. There were no signs of forced entry. Olson, clad only in a shirt, was lying on his stomach in a pool of blood in the front part of the house. Electrical cords were tied around his hands and right ankle. A steak knife handle covered with blood was on the floor of the living room; the blade was found by the police in the fireplace. Another kitchen knife was on the kitchen floor, its blade bent. There was a trail of blood leading to the kitchen, blood on the steps leading upstairs, and blood on the floor and bedsheets in Olson's upstairs bedroom. Police experts found shoeprints in the blood on the floor and fingerprints on a number of items, including a glass. The house had been ransacked and a number of items taken. Olson's car was also missing.

The pathologist estimated that Olson was killed sometime between 1:00 a.m. and 10:00 p.m. on July 4. He found 40 different slash and stab wounds on the body, including 20 stab wounds to the chest and nine in the lower back. Some of the wounds were defensive wounds. Olson sustained serious injuries to the right lung, the liver, and the small bowel. The fatal wound was one to the heart. Of the other internal injuries, only the injury to the small bowel occurred after death.

Police located Olson's car on July 10 in an apartment parking lot in North Minneapolis. A witness stated that the car had been parked there for four days. Police found more fingerprints in the car, some of which matched prints found on the glass at the scene of the killing. A computer comparison of the prints with those in the computer data bank indicated that the prints were made by defendant.

Police learned from welfare authorities that defendant was then residing at the Arcola Hotel in downtown Minneapolis. On July 13 they obtained and executed a warrant to search defendant's room there. The search resulted in the discovery and seizure of a television set missing from Olson's house. Defendant was arrested outside the hotel later on the 13th. He was wearing a wristwatch and tie tack that belonged to Olson. An address book in defendant's pocket revealed that his girl friend lived only three blocks from the address where Olson's car was found. An expert concluded that the shoeprints found at the scene were from shoes that were the same size, shape and design and that had the same wear marks as the shoes defendant was wearing when arrested.

Police located two pieces of artwork missing from Olson's house at the Royal Star Liquidators, an auction house and dealer in second-hand furniture. Defendant, a frequent visitor to the store, had sold the pictures to the store on July 6.

The other-crime evidence admitted against defendant consisted of evidence that on June 11, 1983, defendant became angry with an acquaintance, Marleen Witte, in her residence, held a kitchen knife to her throat, threatened to kill her, tied her hands and one foot behind her back in much the same way that Olson was found tied, and then stole her television and her car. Defendant sold the television to Royal Star Liquidators on June 14. The car was recovered in St. Paul a few weeks later.

Defendant testified that he met Olson on the afternoon of July 3 in Stevens Square Park while watching some people play basketball. He said that during their conver-

sation he told Olson he painted houses and did minor repairs and that Olson asked him to come with him and give him an estimate on painting his house. He testified that while at Olson's house Olson told him that he was a homosexual and began to undress. He claimed that he went downstairs and was joined by Olson after Olson changed clothes. Defendant testified that when he asked Olson which bus to take to get home, Olson said that defendant could drive his car and that he would ride along. Defendant claimed that Olson dropped him off at his sister's house at 8:30 or 9:00 p.m. on July 3 and that that was the last time he saw Olson. He testified that he spent that night at his sister's place, spent July 4 with his girl friend, then checked into the hotel with his girl friend at 7:00 p.m. on the 4th. He denied that he took any items from Olson and claimed that he bought the television set and the watch a few weeks earlier from a man in a grocery store parking lot and bought the tie tack in a thrift shop.

Defendant also denied that he ever tied up and robbed Marleen Witte. He claimed that she loaned him her car and that he drove it for a few days, then abandoned it. He claimed that he found the television set he sold to Royal Star Liquidators in the back seat of Witte's car.

Two of defendant's sisters and his girl friend testified as alibi witnesses.

State's rebuttal witnesses established that Olson was with his brother on the afternoon of July 3 until 5:00 p.m., that he was at the office of his architectual firm on the 3rd between 5:30 and 6:00 p.m., and that he talked with his brother on the telephone on the 3rd at about 11:30 p.m.

■ 1. Defendant's contention that the state failed to prove that he killed Olson is without merit, as is his contention that the state failed to prove either that he premeditated Olson's death or intentionally killed him in the commission of an aggravated robbery. The evidence that defendant killed Olson was overwhelming. The only real issue for the jury was whether defendant did so either with premeditation or with

intent during the commission of an aggravated robbery. The 40 stab wounds, the fact that there was blood all over the house, and the fact that Olson was found tied up in a position that made movement nearly impossible indicated that the stabbing and slashing took place in more than one part of the house and over a period of time before Olson was bound. The testimony of the pathologist that death likely occurred within one minute of the infliction of the fatal wound to the heart and the unlikelihood that defendant would have tied the victim after the victim was dead indicated further that defendant inflicted the fatal wound after tying the victim. "Extensive planning and calculated deliberation need not be shown by the prosecution [to establish premeditation]. The requisite 'plan' to commit first-degree murder can be formulated virtually instantaneously by a killer." *State v. Neumann,* 262 N.W.2d 426, 430 (Minn.1978). While a mere series of blows may not be enough to justify a finding of premeditation, *State v. Swain,* 269 N.W.2d 707, 714 (Minn.1978), a long and severe beating may be enough. *State v. Walker,* 306 Minn. 105, 235 N.W.2d 810 (1975), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976). This case, like the recent case of *State v. Spurgin,* 358 N.W.2d 648, 651–52 (Minn.1984), is more like *Walker* than *Swain,* with the totality of the circumstances sufficiently establishing that the killing was premeditated.

We also conclude that the evidence was sufficient to support a finding of intentional murder during the commission of an aggravated robbery and not just, as defendant contends, a homicide accompanied by a theft of property.

2. Defendant raises four issues in support of his contention that he should be given a new trial:

(a) First, defendant argues that the prosecutor violated the discovery rules by failing to disclose that an expert, Lieutenant Arvidson of the identification unit of the police department, had lifted a latent fingerprint from a wooden box in the victim's living room and matched it with defendant's known prints. The print apparently

was temporarily lost by the police when it slipped through a crack in the evidence box and was not found until 6 weeks later. Arvidson testified that, because the print was of relatively poor quality, he did not report the results of his comparison. The state became aware of the existence of the print during its testimonial examination of a different officer, Sergeant Weiner. The prosecutor asked Lieutenant Arvidson about the print the morning before he testified and learned of the match for the first time. The prosecutor did not disclose the evidence before he began his questioning of Arvidson. After the prosecutor elicited the testimony of the match, defense counsel approached the bench and moved for a mistrial. The trial court concluded that the prosecutor should have disclosed the information, but denied the motion for a mistrial and instructed the jury to disregard the entire testimony regarding the fingerprint. Defendant renewed the motion for a mistrial after the state rested its case, and the trial court again denied the motion.

■■■ In *State v. Lindsey*, 284 N.W.2d 368, 373 (Minn.1979), we recognized that the trial court has discretion in determining whether to impose sanctions for failure to comply with discovery rules. We indicated that the trial court should consider all relevant factors in exercising its discretion, including the reason why disclosure was not made, the extent of prejudice to the imposing party, and the feasibility of rectifying any prejudice by a continuance. *Id.* We would not hesitate to reverse the conviction and award the defendant a new trial if we concluded that the state's failure to comply with the discovery rules was prejudicial. *See e.g., State v. Zeimet*, 310 N.W.2d 552 (Minn.1981) (reversing a conviction based on the prosecutor's failure to disclose information concerning the culpability of a person closely connected to the case). Here the prosecutor clearly violated Minn.R.Crim.P. 9.01, subd. 1(4), which requires the prosecutor to "disclose and permit defense counsel to inspect and reproduce any results or reports of * * * scientific tests, experiments or comparisons made in connection with the particular case." Nevertheless, we are satisfied that the defendant was not prejudiced by the

failure to disclose; a great deal of properly admitted evidence, including other fingerprint evidence, linked the defendant to the killing.

■■ A related issue is whether defendant was prejudiced by the prosecutor's violation of Minn.R.Crim.P. 9.02, subd. 2(c), in obtaining fingerprints from defendant without first obtaining a court order. Before trial, defendant's attorney notified the prosecutor that he would object at trial if the state attempted to introduce a fingerprint card which contained prints obtained from defendant in connection with a prior arrest. The police had used that card to identify the prints found in the victim's car and the prints found at the scene. To avoid this potential problem, the prosecutor told the police experts who were planning to testify at trial to either obtain new fingerprints from defendant or use the fingerprint card made at the time of defendant's July 13 arrest. The experts decided to obtain fresh fingerprints and, without obtaining a court order as required by Minn. R.Crim.P. 9.02, subd. 2, they fingerprinted defendant when he appeared for trial. Defendant's attorney informed the court that he would object if the state tried to use the newly obtained prints at trial. He also told the court that he intended to object to the use of the fingerprint card from the prior arrest because the jury would learn that defendant had been arrested before and defendant's case would be prejudiced. The court ruled that the new fingerprints obtained without a court order were inadmissible. When the state offered the fingerprint card obtained in connection with the previous arrest, the court ruled it admissible. Therefore, the fingerprints which were improperly obtained were never used at trial and defendant was not prejudiced by the improper fingerprinting.

■■ Defendant also argues that he was prejudiced by the prosecutor's failure to allow his experts to inspect FBI exhibits until the day before the FBI expert testified. In fact, the exhibits were essentially enlargements of photographs and summaries of reports which the prosecutor had turned over to defendant's counsel two weeks before trial.

(b) Defendant argues that the trial court abused its discretion in denying his pretrial motion for a continuance.

■ On November 22, 1983, approximately one week before the scheduled trial date, defendant moved for a continuance because his expert had not yet had an opportunity to analyze certain physical evidence which the state had sent to the FBI for analysis but which had not yet been returned. The court granted the motion and continued the trial date to January 4, 1984. On January 4, the court granted another continuance because the state had just received the evidence and given it to the defense for analysis. On January 23, the date jury selection began, defendant sought another continuance, this time because his expert had not found time to analyze the evidence. This time the court denied the motion. Defense counsel renewed the motion, on January 25, stating that, upon a preliminary examination, his expert disagreed with the FBI report. The court denied the motion. Jury selection was completed January 30. Defendant's case-in-chief did not begin until February 3. Thus, the defense had approximately one month to obtain the expert analysis before presenting its case. Furthermore, the defendant has never made an offer of proof that with a continuance of a few more weeks his expert would have been able to rebut the FBI expert. In conclusion, the record does not establish either that the trial court abused its discretion in denying the continuance or that the denial prejudiced defendant by preventing him from obtaining expert testimony that he would otherwise have been able to obtain.

(c) An issue which merits more detailed analysis is whether the trial court erred in denying defendant's motion to suppress the evidence discovered in the search of the hotel room and evidence seized from defendant when he was arrested. Defendant claims that this evidence was the suppressible fruit of information which was illegally obtained, namely, his address. Police obtained the address from the Hennepin County Bureau of Social Services.

Defendant bases his contention that the address was illegally obtained on the Minnesota Government Practices Act, Minn. Stat. ch. 13 (1982 and Supp.1983). Section 13.46, subd. 2, of the Act provides limitations on disclosure of certain data:

Subd. 2. **General.** Unless the data is summary data or a statute specifically provides a different classification, data on individuals collected, maintained, used or disseminated by the welfare system is private data on individuals, and shall not be disclosed except:

(a) Pursuant to section 13.05;

(b) Pursuant to a valid court order;

(c) Pursuant to a statute specifically authorizing access to the private data;

(d) To an agent of the welfare system, including appropriate law enforcement personnel, who are acting in the investigation, prosecution, criminal or civil proceeding relating to the administration of a program;

(e) To personnel of the welfare system who require the data to determine eligibility, amount of assistance, and the need to provide services of additional programs to the individual;

(f) To administer federal funds or programs;

(g) Between personnel of the welfare system working in the same program;

(h) The amounts of cash public assistance and relief paid to welfare recipients in this state, including their names and social security numbers, upon request by the department of revenue to administer the property tax refund law, supplemental housing allowance, and the income tax; or

(i) To the Minnesota department of economic security for the purpose of monitoring the eligibility of the data subject for unemployment compensation or for any employment or training program administered by that agency, whether alone or in conjunction with the welfare system.

Minn.Stat. § 13.46, subd. 2 (Supp.1983). Section 13.02, subd. 5 defines "data on individuals" as meaning "all government data

504

in which any individual is or can be identified as the subject of that data, unless the appearance of the name or other identifying data can be clearly demonstrated to be only incidental to the data and the data are not accessed by the name or other identifying data of any individual." Minn.Stat. § 13.06, subd. 5 (1984). Minn.R. § 1205.-0200, sub. 4 (1983) provides in relevant part:

'[D]ata on individuals' if it identifies an individual in itself, or if it can be used in connection with other data elements to uniquely identify an individual. Such data shall include, but is not limited to, street addresses, job titles, and so forth where the particular data could only describe or identify one individual.

This seems to indicate that even the limited disclosure of the address of a welfare client to police who have probable cause to arrest the client for murder is prohibited by section 13.46, subd. 2, absent a court order. Nonetheless, in view of prior decisions of this court [1] and the strong policy arguments in favor of limited disclosure to police of a recipient's address under circumstances such as those presented here, we are reluctant to conclude that the disclosure constituted a violation of the Act. We

need not decide the issue, however, since the real issue is not whether the information was improperly disclosed but whether the trial court erred in refusing to suppress the evidence seized in the resulting searches.

In arguing that the refusal to suppress was erroneous, defendant cites Minn.Stat. § 626.21 (1982), which provides that "[a] person aggrieved by an unlawful search and seizure," may move the suppression of the use of the property on the ground that "* * * (1) the property was illegally seized, or * * * (6) the warrant was illegally executed, or (7) the warrant was improvidently granted." We have indicated in a number of cases, however, that we will not require suppression of all evidence seized in searches constituting, or resulting from, a violation of a statute. See e.g., State v. Lien, 265 N.W.2d 833, 841 (Minn.1978) (holding that technical violation of statutory prohibition of night-time execution of search warrant absent court determination of necessity does not require suppression of evidence seized in otherwise lawful search). If there was a violation of the statute in this case, it was a technical violation which did not subvert the basic purpose of the statute. There can be little

1. In State v. Wiley, 295 Minn. 411, 205 N.W.2d 667 (1973), decided prior to the enactment of Minn.Stat. § 13.46, we upheld the admission of welfare records of the defendant's arrest in a criminal case in which the issue was whether the defendant had a possessory interest in a house in which drugs were found. We stated:

Defendant's next objections go to the admission of welfare records and testimony of welfare officials which were used to show that defendant had given his address as 4717 Fourth Avenue South. Defendant first argues that the welfare information was privileged. In State v. Lender, 266 Minn. 561, 124 N.W.2d 355 (1963), we concluded that certain communications made to welfare agencies were not privileged, relying on Minn.St. [sic] § 595.-02(5), which provides that the privilege shall apply to public officers "when the public interest would suffer by the disclosure." Although defendant points out that the Department of Public Welfare has promulgated regulations since Lender which limit the disclosure of welfare information (Department of Public Welfare Reg. No. 45), we think the issue in this case is foreclosed by State ex rel. Trimble v. Hedman, 291 Minn. 442, 192 N.W.2d 432 (1971). In that case, we upheld

the admissibility of a telephone conversation between the relator and a police officer who called her ostensibly to discuss welfare payments where the evidence was used solely as a means of identification and not for the purpose of disclosing relator's welfare status. We similarly uphold the use of the welfare records in the instant case where the evidence does not relate to defendant's welfare status but only to the identification of his residence. 295 Minn. at 419, 205 N.W.2d at 674. The main protection offered a welfare recipient by the prohibition on unauthorized disclosure of private data on him, including his address, is the protection from disclosure of information identifying him as a recipient and information which the recipient has a legitimate interest in keeping private. Here, the information was not used by the police to disclose defendant's welfare status to the public but only to establish that defendant was living in a hotel room they wanted to search. Indeed, the affidavit in support of the search warrant application simply stated, "Through investigation, I learned that SMITH currently lives at the Arcola Hotel * * * and that he checked into that address on 7-4-83 under the above name."

doubt that a court order would have been issued on request.

 It is also clear that the disclosure did not violate any of defendant's constitutional rights so as to require suppression of the fruits of the search and arrest. Any constitutional right that a person has to informational privacy clearly does not extend to his address. *Whalen v. Roe,* 429 U.S. 589, 605, 97 S.Ct. 869, 879, 51 L.Ed.2d 64 (1977) (indicating that interest in avoiding disclosure of "personal matters" applies to matters "personal in character and potentially embarrassing or harmful if disclosed"). Stated baldly, a murderer's expectation that welfare officials will not provide his address to police officers who have probable cause to arrest him is not the sort of expectation that society considers reasonable, either under the Fourth Amendment or under any other provision of the Federal Constitution. 1 W. LaFave, *Search and Seizure* § 2.7(c) at 413 (1978) ("[I]f law enforcement agents were allowed to consult business records which merely revealed a person's name or address or telephone number, this does not offend any interests protected by the Fourth Amendment").[2]

In conclusion, we are satisfied that the police acted lawfully in obtaining and executing the search warrant and in arresting defendant and searching him incident to that arrest.

 (d) Defendant's final contention is that the trial court erred in admitting the other-crime evidence. The admission of other-crime evidence is governed by Minn. R.Evid. 404(b). The "preferred approach" to applying this rule is to determine "if the evidence is relevant and material to the state's case, if the evidence of the defendant's participation in the offense is clear and convincing, and if the probative charac-

ter of the evidence outweighs its potential for unfair prejudice." *State v. Filippi,* 335 N.W.2d 739, 743 (Minn.1983). "In determining relevancy, we have generally required that the other crime be similar in some way—either in time, location, or *modus operandi*—to the charged offense, although this, of course, is not an absolute necessity." *Id.* In this case there was a clear and significant relationship between the offenses in terms of time, location, and *modus operandi,* and the probative value of the evidence was not outweighed by the potential of the evidence for unfair prejudice. *State v. Kumpula,* 355 N.W.2d 697, 702–03 (Minn.1984). We therefore conclude that the trial court did not abuse its discretion in admitting the evidence.

Affirmed.

---

**2.** In *United States v. Miller,* 425 U.S. 435, 442, 96 S.Ct. 1619, 1623, 48 L.Ed.2d 71 (1976), the United States Supreme Court held that a bank depositor has no reasonable expectation of privacy under the constitution in his bank records. As one commentator has noted, *Miller* and other cases "demonstrate the Court's unwillingness to extend fourth amendment secrecy protection to information that an individual already has re- vealed or otherwise delivered to others * * *." Note, *The Interest in Limiting the Disclosure of Personal Information: A Constitutional Analysis,"* 36 Vand.L.Rev. 139, 157-8 (1983). Professor LaFave, who disagrees with the holding in *Miller,* argues that a distinction should be made between information such as a person's address and information such as bank records. 1 La- Fave, *Search and Seizure* § 2.7(c) at 413 (1978).