**STATE of Minnesota, Respondent,**

v.

**Pierre LEAKE, Appellant.**

**No. A04–57.**

Supreme Court of Minnesota.

June 23, 2005.

Roy G. Spurbeck, Assistant State Public Defender, Minneapolis, MN, for Appellant; Appellant, pro se.

Mike Hatch, Attorney General, St. Paul, MN; Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

BLATZ, Chief Justice.

On September 22, 2003, a jury found appellant Pierre Leake guilty of first-degree premeditated murder in connection with the stabbing death of Megan Fisher. The trial court then convicted Leake of first-degree murder and sentenced him to life without the possibility of release. On appeal, Leake argues that the evidence was insufficient to prove premeditation beyond a reasonable doubt and that his sentence is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). In his pro se supplemental brief, Leake also argues that his conviction must be overturned because: (1) the verdicts of not guilty of second-degree intentional murder and guilty of first-degree premeditated murder are legally inconsistent; (2) the prosecutor committed misconduct in closing argument; and (3) the grand jury and trial testimony were inconsistent. We affirm.

On March 22, 2003, Angela Behling found her roommate, Megan Fisher, stabbed to death in Fisher's bedroom. Fisher shared a two-bedroom Minneapolis apartment with Behling, whom she met while attending culinary school. The apartment building was a secure building that required visitors to be let in using an intercom system at the front door.

Within two days of Fisher's murder, police arrested Leake. Evidence presented at trial indicated that Leake and Fisher met in the fall of either 2001 or 2002 and that they developed a romantic relationship. Behling testified that when Leake got together with Fisher, he would usually call Fisher late at night, come to the back door of the apartment building, and be let in by Fisher. Behling did not always know that Leake had come to the apartment until Fisher told her the next day. Behling also testified that, to her knowledge, Fisher did not give Leake a key to the apartment.

In the weeks prior to her murder, Fisher expressed frustration to her mother and a friend, Jenna Nerdby, because Leake would be late for dates or not show up at all. She also complained to Behling that Leake was secretive and did not tell her anything about himself.

On March 14, 2003, Fisher went to a Minneapolis bar with some friends. Leake met Fisher at the bar so Fisher could sell him a drug scale. When Leake arrived, he and Fisher went outside. Fisher saw that another woman, Corrine Miller, was waiting in Leake's car. Fisher, upset that Leake brought another woman with him to the bar, told Nerdby that she was "done

with this." Nerdby testified at trial that when Fisher said she was "done with this," Nerdby understood Fisher to mean done with everything to do with Leake—including their relationship. Consistent with Nerdby's testimony, Behling testified that Fisher told her that same evening that she was done "talking to [Leake], done with everything to do with him."

A few days before her murder, Fisher told her mother that Leake was calling her all the time and she no longer wanted to take phone calls from him. She also told her mother that Leake was "harassing me, bugging me" and that because she did not want to talk to Leake, she no longer answered her phone unless she knew the number that appeared on her caller identification.

On March 21, 2003, a friend joined Fisher at her apartment before they went to an office party at a bar. Around 8:00 p.m., Fisher's cell phone rang and Leake's name appeared on her cell phone's caller identification. Fisher told her friend not to answer the phone, but did not say why.[1]

When several other friends arrived, including Fisher's roommate Behling, they all went to the office party. After arriving at the bar, Behling did not feel well so Fisher and another friend, Bob Thompson, drove Behling back to the apartment at about 12:20 a.m. Fisher and Thompson then left the apartment and met friends at another bar. Thompson took Fisher home around 1:10 a.m., and at about 1:40 a.m., Fisher called a friend in California, Jennifer DeRosa. DeRosa testified at trial that Fisher did not indicate that she was expecting company. At 2:00 a.m., Fisher called one of the friends she had been out with that night and left a message on the friend's cell phone.

According to cell phone records, there was a call from Fisher's cell phone to Leake's cell phone at 1:27 a.m. on March 22. That call went to Leake's voicemail. At 1:54 a.m., Leake's voicemail was checked. A three-minute phone call was made from Leake's cell phone to Fisher's cell phone at 1:56 a.m. At 2:45 a.m., a one minute call was made from Leake's phone—with the number blocked—to Fisher's phone. This was the only call from Leake's phone to Fisher's phone in the previous four months in which the phone number was blocked.

A representative from the cell phone company testified at trial about how cell phone calls are transmitted, explaining that, in the absence of an unlikely event, cell phone calls "bounce off" the closest transmission tower before being transmitted to the receiver. According to the phone company's records, several calls from Leake's cell phone, between 1:30 a.m. and 2:13 a.m. on March 22, 2003, bounced off the cell tower near his New Brighton apartment. The 2:45 a.m. call made from Leake's cell phone bounced off a tower in Minneapolis located near Fisher's apartment. Fisher's 1:27 and 1:40 a.m. calls bounced off this same tower near her apartment.

Behling did not hear Fisher arrive home in the early morning hours of March 22, but around 3:45 a.m., Behling was awakened by a noise in the apartment. Before falling back to sleep, Behling surmised that Fisher was awake, which surprised her. When Behling woke up later that morning, she observed that Fisher's door was closed and that the bath mat, three bathroom towels, and the hall rug—all of which had been in the apartment the night

---

**1.** Cell phone records, introduced as exhibits at trial, confirm that a call was made at about 8:00 p.m. on the evening of March 21, 2003 from Leake's cell phone to Fisher's cell phone and that the call was not answered.

before—were missing. Behling also noticed that the deadbolt lock on the apartment door was not locked. Although Behling found it strange that the door was unlocked and the rugs were missing, she thought that Fisher had decided to launder the rugs and had simply forgotten to lock the apartment door.

Behling took a shower and left the apartment at about 10:00 a.m., locking the door on her way out. Around 6:00 or 6:30 p.m., Behling returned to the apartment with plans to attend a wedding that evening with Fisher. When she opened the door to Fisher's bedroom to find out when they were leaving, she discovered Fisher, lying on her bed, stabbed to death. Behling called 911.

During their investigation, police and crime lab technicians searched the apartment and the surrounding area for evidence. Fisher's cell phone and bathroom towels were never located, but the hallway rug with the bathmat rolled inside was found behind a dumpster in back of the apartment building. The duvet and mattress cover on Fisher's bed contained several cuts and tears consistent with someone stabbing them.

On the day of the murder, Behling told police that the only knives she and Fisher kept in the apartment were two paring knives—one with a black handle and one with a red handle—but later remembered, and told the police, that she and Fisher had purchased knife sets for the culinary school they both attended. Behling testified at trial that she kept her knife set under her bed in her bedroom, where it was found covered in a layer of dust after the murder. Behling also testified that Fisher kept her set in the kitchen on top of

a cupboard with a long serrated bread knife sitting on top. Behling said the serrated knife had been sitting on Fisher's knife set in the kitchen for months before the murder and that she specifically remembered seeing it there "a few weeks" before the murder. The red-handled paring knife and the serrated bread knife were never recovered.[2]

The police collected samples of "blood-like substances" from numerous places in the apartment. The Minnesota Bureau of Criminal Apprehension (BCA) tested those substances as well as a biological sample taken from underneath Fisher's fingernail. At trial, a forensic scientist with the BCA testified that the samples taken from Fisher's bedroom wall and from other items in her bedroom matched Fisher's DNA profile. Samples taken from the bathroom door, hall closet doorknob, kitchen floor, hallway floor, bath mat, area rug, and end table all matched Leake's DNA profile. The sample from underneath Fisher's fingernail was a mixture consistent with a combination of DNA from Leake and Fisher. There was no predominant contributor to this mixture, and 99.9997% of the population could be excluded from having contributed to it.

Dr. Mitchell Morey, a Hennepin County assistant medical examiner, also testified at trial. He determined that Fisher died from multiple sharp-force injuries. According to Morey, sharp-force injuries fall into two categories: (1) stab wounds, which are deeper than they are wide; and (2) incisional wounds, which are wider than they are deep. Fisher had at least 17 stab wounds and at least five incisional wounds. All of the wounds were consistent with having been inflicted by a knife. Fatal

---

2. During the investigation, the police took Fisher's knife set to the culinary school and the director told them that a long serrated bread knife was missing from the set. The police then obtained a replica of the missing knife, which was introduced into evidence at trial.

wounds cut through her spinal cord, vertebral arteries, jugular vein, and vena cava. Morey testified that at least some of the wounds were consistent with having been inflicted by a serrated blade. According to Morey, those wounds were consistent with a replica of the serrated knife that was missing from Fisher's knife set. The medical examiner could not determine in what order the injuries occurred or which of three potentially fatal blows actually killed Fisher. Fisher had few defensive wounds.

At trial, Kathy Deutschlander, Leake's ex-wife, also testified for the state. She was married to Leake at the time of the murder, but their marriage was dissolved prior to trial. Deutschlander testified that at 1:30 a.m. on the night of the murder, her two-year-old son woke her up because he wanted something to drink. When she went to get her son a glass of milk, she saw Leake playing video games in the living room of their New Brighton apartment. She spoke to him briefly, but did not notice any injury to his right hand. Deutschlander did not believe that Leake came to bed that night, but heard him in the shower around 6:00 a.m. Later, she observed that after his shower he was wearing different clothes than he had worn the previous night and that he had a "bad cut" on his right hand. She also observed him talking to himself, reciting what sounded like a "to-do list," and putting items, including towels, a t-shirt, and sweat pants into a garbage bag. Deutschlander saw him take the garbage bag outside and place it inside their Jeep. He then moved a different garbage bag from the trunk of their Oldsmobile to the Jeep. Deutschlander testified that, while watching him from the window of their apartment, she saw him drive the Jeep by the apartment dumpsters but she did not observe him dispose of the garbage bags.

Corrine Miller, Leake's friend and companion the evening Leake met Fisher at the bar to get a drug scale, also testified at trial. Miller met Leake in November 2002 and they were in a relationship. She testified that Leake arrived at her house outside Stillwater around 6:30 a.m. on March 22. They had plans to meet to lift weights at 8:00 a.m., but she was not expecting him at her house before that time. When Leake arrived, he had a towel wrapped around his hand. He told her that he had cut his hand on a piece of glass while taking out the garbage. Before Miller left to run an errand, Leake asked if he could start a fire and she agreed. Miller thought Leake wanted to start the fire in the inside fireplace because it was cold, but when she returned from her errand, she discovered that Leake had started a fire in the backyard pit. While Miller was not sure what Leake was burning, she thought she saw fabric in the fire and "stuffing" or "fibers" all over the yard. Leake told Miller he was burning a teddy bear and trash, but when she asked about a bag of items that Leake had with him, he responded, "you sure ask a lot of questions."[3] She did not question him further.

Miller, who is a nurse, looked at the cut on Leake's hand and suggested he go to a nearby hospital to see a doctor. At the hospital, Leake told the doctor, in the presence of Miller, that he had cut his hand on some broken glass while taking out the garbage. Leake was irritable after the hospital visit and told Miller he needed to go home to see his son. When Leake returned to his apartment, Deutschlander saw that Leake's hand had stitches and was bandaged.

At about midnight on March 23, the police arrested Leake at his home and searched the apartment. In the early

---

**3.** Fisher's brother testified at trial that Fisher had many stuffed animals in her bedroom.

morning hours of March 24, and again later that day, police searched the garbage dumpsters around Leake's apartment but did not find any broken glass or blood.[4] Photographs of Leake's right hand, taken by police, showed a linear cut with several stitches. Leake was charged with premeditated first-degree murder in violation of Minn.Stat. § 609.185(a)(1) (2004), and intentional second-degree murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2004).

The jury returned a guilty verdict on the count of first-degree premeditated murder and a not guilty verdict on the count of second-degree intentional murder. At sentencing, the state presented evidence related to Leake's 1998 conviction for third-degree criminal sexual conduct. This evidence was critical to the determination of whether Leake had previously been convicted of a "heinous crime" under Minn.Stat. § 609.106 (2004), thereby requiring the trial court to sentence him to life imprisonment with no possibility of release. The court found that the prior offense qualified as a heinous crime. This appeal followed.

## I.

■ We first address Leake's contention that the evidence presented at trial was insufficient to prove the element of premeditation beyond a reasonable doubt. When reviewing a claim of evidentiary insufficiency, we view the evidence in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict. *State v. Chomnarith*, 654 N.W.2d 660, 664 (Minn.2003). The verdict will not be overturned if, giving due regard to the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offense. *Id.*

■ A person who "causes the death of a human being with premeditation and with intent to effect the death of the person" is guilty of first-degree murder. Minn.Stat. § 609.185(a)(1). Premeditation means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2004). "A finding of premeditation does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation." *State v. Cooper*, 561 N.W.2d 175, 180 (Minn.1997). However, the state "must prove that, after the defendant formed the intent to kill, some appreciable time passed" during which the defendant considered, planned, prepared, or determined to commit the act. *Id.*

■ Premeditation is a state of mind and, thus, generally proven through circumstantial evidence. *Id.* at 179. Circumstantial evidence is entitled to the same weight as any other evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt. *Chomnarith*, 654 N.W.2d at 664. A conviction based on circumstantial evidence stands only when "the facts and circumstances disclosed by the circumstantial evidence form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference

---

4. Police later searched Leake's Oldsmobile and collected several samples of blood-like substances. The samples taken from the Oldsmobile matched Leake's DNA profile but the testing of the samples either excluded Fisher or failed to identify her as a contributor.

other than that of guilt." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980).

When reviewing the evidence offered as proof of premeditation, we have stated that the evidence as a whole may support a finding of premeditation even if no single piece of evidence, standing alone, would be sufficient. *State v. Moore*, 481 N.W.2d 355, 361 (Minn.1992). Specifically relevant to this case, we have held that the number of blows inflicted on the victim standing alone is not sufficient to support a finding of premeditation, *State v. Swain*, 269 N.W.2d 707, 714 (Minn.1978), but that numerous blows can indicate premeditation when supported by other evidence. *See, e.g., State v. Smith*, 367 N.W.2d 497, 501 (Minn.1985) (holding evidence of premeditation sufficient where the victim was tied up and stabbed at least 40 times, and the attack took place in more than one area of the house over an extended period of time); *State v. Merrill*, 274 N.W.2d 99, 112 (Minn.1978) (holding evidence of premeditation was sufficient where the defendant admitted hitting the victim with a candy dish, going to the kitchen in search of a knife, and then stabbing the victim 17 times in the bedroom).

In the instant case, the state argues that the totality of the circumstances supports a finding of premeditation. The evidence admitted at trial established that Fisher was stabbed at least 17 times. The majority of the wounds were on her upper back and the back of her neck. Fatal wounds cut through her spinal cord, vertebral arteries, jugular vein, and vena cava. Fisher's almost total lack of defensive wounds suggests that she was restrained during the attack. In addition, the state argues that the evidence indicated that Leake either brought the knife used to stab Fisher to the apartment or took it from the apartment's kitchen—two scenarios that the state argues support premeditation. In turn, Leake argues that the state did not prove he brought the knife with him to the apartment or that he obtained it from Fisher's kitchen.

Reviewing the record before us, we conclude that sufficient proof of premeditation was supplied by the circumstantial evidence presented at trial. Of particular note, Behling testified that two knives were missing from the apartment—a red-handled paring knife and the serrated bread knife. She also testified that the serrated knife was kept in the kitchen and she had seen it there a few weeks before the murder. In addition, expert testimony was offered at trial that Fisher's injuries were consistent with having been caused by a serrated knife. Based on this evidence, the jury could have concluded either: (1) that Leake went to the kitchen, got the serrated knife, and returned to the bedroom where he stabbed Fisher or (2) that Leake brought the knife used to inflict Fisher's wounds from outside the apartment. Although the evidence is circumstantial, it is "consistent with the hypothesis that the accused is guilty"—i.e., that he procured a knife and brought it to Fisher's bedroom where he stabbed her to death—and is "inconsistent with any rational hypothesis except that of guilt." *Chomnarith*, 654 N.W.2d at 664; *see also State v. Netland*, 535 N.W.2d 328, 329–30 (Minn.1995) (holding that the defendant acted with premeditation when he forcibly entered the victims' house, took knives from the victims' kitchen, walked down the hall, and used the knives to stab the victims); *Bangert v. State*, 282 N.W.2d 540, 544 (Minn.1979) (holding evidence of premeditation sufficient where the defendant procured a rifle from the victims' house, walked down the hallway to the bedroom, took aim, and fired three shots into the heads of the victims as they slept).

In addition, a defendant's actions before and after the murder are relevant to the question of premeditation. *State v. Lodermeier,* 539 N.W.2d 396, 398 (Minn.1995). Here, the record reflects that just before the murder Leake disguised his telephone call to Fisher by blocking the number and that after the murder he disposed of evidence by putting it in garbage bags and burning it in a fire.[5]

When analyzed separately, it is doubtful that we would conclude that any one piece of this evidence is sufficient to support a finding of premeditation. However, we do not have one piece of evidence before us on review, but rather the "totality of the circumstances." Taking the evidence as a whole and viewing it in the light most favorable to the jury's verdict, we hold that the evidence is sufficient to support the jury's finding that Fisher's murder was premeditated.

## II.

■ We next address Leake's challenge to the constitutionality of his sentence of life without the possibility of release under Minn.Stat. § 609.106 (2004). Under Minnesota law, a conviction of first-degree premeditated murder is punishable by a term of life in prison. Minn.Stat. § 609.185(a) (2004). A person serving a life term generally is eligible for supervised release after serving 30 years. Minn.Stat. § 244.05, subd. 4 (2004). However, a defendant convicted of first-degree premeditated murder who has a prior conviction for a "heinous crime" must be sentenced to life imprisonment without the possibility of release. Minn.Stat. §§ 609.106, subd. 2(3); 244.05, subd. 4. Heinous crimes include first-, second-, and third-degree criminal sexual conduct "if the offense was committed with force or violence." Minn.Stat. § 609.106, subd. 1(3).

In this case, Leake had a prior conviction for third-degree criminal sexual conduct in violation of Minn.Stat. § 609.344, subd. 1(c) (2004). Third-degree criminal sexual conduct is defined, *inter alia,* as engaging in sexual penetration with another person if "the actor uses *force or coercion* to accomplish the penetration." *Id.* (emphasis added). The statute does not distinguish between force and coercion, indicating that the presence of either—or both—satisfies the requirement. However, in order for a third-degree criminal sexual conduct conviction to qualify as a "heinous crime" under Minn.Stat. § 609.106, subd. 1(3), the crime must have been committed with "force or violence." Thus, third-degree criminal sexual conduct convictions that involve coercion alone, with no use of force, do not qualify as a "heinous crime." Accordingly, in this case, when sentencing the defendant for first-degree premeditated murder under the heinous crime statute, it must be determined whether the prior conviction for third-degree criminal sexual conduct was committed with force or violence—and not coercion alone.

In this case, after the jury found Leake guilty of first-degree premeditated mur-

---

5. In addition to the evidence about the number of wounds, opportunity, and lack of defensive wounds, the state cites evidence of a strained relationship as additional support for finding premeditation. Specifically, the state refers to the fact that Fisher's mother and friends testified that Fisher was frustrated with her relationship with Leake, said she was "done with this," and was avoiding his calls. While evidence of a strained relationship can be relevant to premeditation, *see State v. Moore,* 481 N.W.2d 355, 362 (Minn. 1992), we think the relationship evidence in this case provides, at best, minimal support for a finding of premeditation and thus we do not rely on the relationship evidence in our discussion of premeditation.

der, the trial court held a post-trial evidentiary hearing in connection with sentencing and, while noting potential problems under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), found that Leake's prior conviction for third-degree criminal sexual conduct was committed with force or violence and therefore qualified as a heinous crime. The court based this conclusion on the victim's testimony at the hearing and Leake's admissions in connection with his guilty plea. Accordingly, Leake was sentenced under the heinous crime statute, Minn.Stat. § 609.106, subd. 2, to life in prison without release.

■ Leake argues that his sentence is unconstitutional under *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), because the sentence was based on the trial court's finding that Leake's previous offense was committed with "force or violence." In Leake's view, the factual finding as to the manner of the previous offense—whether it was committed with "force or violence" as opposed to "coercion"—must be made by a jury. This presents a legal issue which we review de novo. *See State v. Myers*, 627 N.W.2d 58, 62 (Minn.2001).

In *Apprendi*, the defendant pleaded guilty to possession of a firearm for an unlawful purpose. 530 U.S. at 469–70, 120 S.Ct. 2348. He received an enhanced sentence based on a judge's finding, by a preponderance of the evidence, that the crime was motivated by racial bias. *Id.* at 471, 120 S.Ct. 2348. The United States Supreme Court reversed, holding that: "Other than the fact of a prior conviction, any fact that increased the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and

proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348.

After *Apprendi*, it was not clear what the Court meant by the term "statutory maximum." In *State v. Smith*, we addressed whether the heinous crime statute, at issue here, violated the rule in *Apprendi*. 669 N.W.2d 19, 33 (Minn.2003). We concluded that the heinous crime statute set forth "a mandatory sentence that raised the *minimum* sentence from life in prison with the possibility of release after 30 years to life in prison without the possibility of release." *Id.* at 33. Accordingly, we then stated that "[a] defendant sentenced to life without the possibility of parole has the same statutory maximum; i.e., the sentence ends at the end of the defendant's life." *Id.* Our analysis allowing the judge's factual finding to stand when only the minimum—and not the maximum—sentence was implicated, was based, in part, on *Harris v. United States*, 536 U.S. 545, 567, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), where the United States Supreme Court held that *Apprendi* did not preclude a judge from making a factual determination affecting the minimum sentence. *Smith*, 669 N.W.2d at 33. Applying the Court's reasoning in *Apprendi* and *Harris*, we held that "the constitutional protections articulated in *Apprendi* are not implicated in this case because only the minimum term of imprisonment is affected by a finding of a heinous crime and, therefore, the determination of a prior heinous crime may be found by the court." *Smith*, 669 N.W.2d at 33.

Subsequent to our decision in *Smith*, in *Blakely* the Supreme Court addressed whether an upward sentencing departure under Washington's sentencing guidelines violated the defendant's Sixth Amendment right to a jury trial because the district court, rather than a jury, made findings to support the departure. 542 U.S. at ——,

124 S.Ct. at 2534–36. The Supreme Court held that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after. finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* at ——, 124 S.Ct. at 2537 (emphasis in original). Thus, *Blakely* makes clear that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Id.* (emphasis in original). In light of *Blakely,* Leake urges our court to reexamine our holding in *Smith.*[6]

We agree with Leake that a judge's finding that a prior conviction constitutes a "heinous crime" affects the "statutory maximum." *See Blakely,* 542 U.S. at ——, 124 S.Ct. at 2537. Based on the jury verdict alone, the statutory maximum sentence imposed for first-degree murder under Minn.Stat. § 609.185(a)(1) is life *with* the possibility of release. Minn.Stat. § 244.05, subd. 4. A sentence of life *without* the possibility of release is imposed on defendants convicted under Minn.Stat. § 609.185(a)(1) only if "the court determines on the record at the time of sentencing that the person has one or more previous convictions for a heinous crime." Minn.Stat. § 609.106, subd. 2(3). In *Smith,* because we concluded that the heinous crime statute did not affect the maximum sentence, we held that *Apprendi* was not implicated. Having concluded here that the statutory maximum, as clarified in *Blakely,* is affected by the determination that a defendant has a previous conviction qualifying as a heinous crime, we now overrule *Smith* to the extent it is inconsistent with this opinion and hold that the "statutory maximum" for first-degree mur-

der under Minn.Stat. § 609.185(a)(1) is life with the possibility of release.

We turn then to the application of *Apprendi* and *Blakely* to the heinous crime statute and the state's argument that the heinous crime statute falls into the "prior conviction exception"—i.e., that a prior conviction can be used to enhance a sentence without the need for a jury finding of the fact of the prior conviction. *Apprendi,* 530 U.S. at 488–90, 120 S.Ct. 2348. In *Apprendi,* the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added). *Blakely* "appl[ied] the rule * * * expressed in *Apprendi*" and defined the "statutory maximum" under that rule. *Blakely,* 542 U.S. at ——, 124 S.Ct. at 2536. Thus, it appears that, after *Blakely,* the prior conviction exception recognized in *Apprendi* retains vitality and it is constitutional for a defendant's sentence to be increased based on a prior conviction without submitting the fact of the conviction to the jury.

Our conclusion that a prior conviction permits an enhanced sentence without additional jury findings, however, does not end the inquiry in this case because, under Minnesota's heinous crime statute, the fact of prior conviction *alone* is not always determinative. As discussed *supra,* a conviction for third-degree criminal sexual conduct includes the element of "force or coercion." Minn.Stat. § 609.344, subd. 1(c). The plain language of the elements of the offense indicates that third-degree criminal sexual conduct can be committed by coercion alone, force alone, or both

---

6. Because this case does not require that we decide whether *Blakely* announced a new rule, we do not reach the issue and nothing in this opinion should be interpreted to foretell our decision on the subject.

force and coercion. *See* Minn.Stat. § 645.16 (2004) ("Every law shall be construed, if possible, to give effect to all its provisions."). Thus, given the language of subdivision 1(3) of the heinous crime statute, a judge cannot enhance a defendant's sentence based on a prior conviction alone, unless it is clear, as required by *Apprendi* and *Blakely*, that the jury found or the defendant admitted that the prior crime was committed with "force or violence" as opposed to "force or coercion."

What remains for our consideration then is the application of the rule to the facts of this case.[7] Under both *Apprendi* and *Blakely*, a defendant's admissions can be used to determine sentencing enhancements. *Blakely*, 542 U.S. at ——, 124 S.Ct. at 2537 ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict *or admitted by the defendant*.") (emphasis altered from original). Here, Leake pleaded guilty to third-degree criminal sexual conduct. At the plea hearing, upon agreement of the parties, Leake's statement to the police was admitted as the factual basis for his plea. In this statement, Leake admitted forcing the victim to have sex with him:

Q: And you physically pulled her back and *forced* her to have sex with you?

A: Yeah.

Q: In your opinion, she didn't want to have sex, correct?

A: Correct.

Q: And then she started getting loud. Was she protesting it, was she telling you to, "Stop, leave me alone, I don't want to do this?"

A: Yeah, she was saying she wants to leave, she doesn't want any part of this.

Q: Okay.

A: She was saying she wants to leave, she doesn't want any part of this.

Q: Okay, and then you just put your weight on her, kind of held her tightly so she couldn't squirm away, is that what you said?

A: Held her, yeah.

(Emphasis added.) In questioning Leake, the police specifically used the word "force," and Leake agreed that he "forced" the victim to have sex with him. He also admitted to putting his "weight" on the victim and holding her. Leake's admissions amount to the use of force as defined in Minn.Stat. § 609.341, subd. 3 (2004).[8] *See In re Welfare of D.L.K.*, 381 N.W.2d 435, 437–38 (Minn.1986) (holding that a juvenile's sudden and painful grabbing and pinching of victim's breast was sufficient use of force to support a conviction of fourth-degree criminal sexual conduct).

Leake's admission to the use of force was made in the context of a plea and established the factual basis for an essential element of the offense charged—"force or coercion." We therefore conclude that Leake's admission that he used "force" in

---

7. We recognize that the state contends that Leake waived his *"Blakely/Apprendi* claim" because he did not object on *Apprendi* grounds at the time of sentencing. But, the sentencing court applied our decision in *Smith* in which we concluded that the heinous crime statute was not implicated by *Apprendi*. Because we hold here that *Blakely* overrules our decision in *Smith*, we decline to hold that Leake waived his claim.

8. Force is defined as "the infliction, attempted infliction, or threatened infliction by the actor of bodily harm or commission or threat of any other crime by the actor against the complainant or another, which (a) causes the complainant to reasonably believe that the actor has the present ability to execute the threat and (b) if the actor does not have a significant relationship to the complainant, also causes the complainant to submit." Minn.Stat. § 609.341, subd. 3.

the commission of his prior offense was considered by the court in determining whether the prior offense qualifies as a heinous crime.

Our conclusion is supported by a recent United States Supreme Court case, which held that a court determining the character of a prior offense is "generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. United States,* —— U.S. ——, 125 S.Ct. 1254, 1257, 161 L.Ed.2d 205 (2005); *see also United States v. Lucca,* 377 F.3d 927, 934 (8th Cir.2004) (holding that an enhanced sentence based on facts contained in a guilty plea satisfies constitutional requirements of admission under *Blakely*); *United States v. Saldivar–Trujillo,* 380 F.3d 274, 279 (6th Cir.2004) (stating that *Blakely* does not affect the validity of a sentence where the sentence was imposed based solely upon facts admitted by defendant as part of his guilty plea); *United States v. Monsalve,* 388 F.3d 71, 73 (2d Cir.2004) (holding that a sentence based on an admission in a plea agreement is consistent with *Blakely*). Accordingly, on this record, we hold that Leake's admission supports the court's use of the conviction under the heinous crime statute.[9] Applying this reasoning, we affirm Leake's sentence of life imprisonment without the possibility of release under the heinous crime statute.

### III.

■ Next, we turn to the issue, raised in Leake's pro se supplemental brief, regarding whether the verdicts of not guilty of second-degree intentional murder and guilty of first-degree premeditated murder are legally inconsistent. The question of whether verdicts are legally inconsistent is a question of law, which we review de novo. *See State v. Blom,* 682 N.W.2d 578, 624 (Minn.2004).

Nothing in the constitution requires consistent verdicts. *United States v. Powell,* 469 U.S. 57, 64–66, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (reaffirming the Court's holding in *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), that consistency in verdicts is not required). In accord with *Powell* and *Dunn,* this court has stated that

> The general rule is that a defendant who is found guilty of one count of a two count indictment or complaint is not entitled to a new trial or a dismissal simply because the jury found him not guilty of the other count, even if the guilty and not guilty verdicts may be said to be logically inconsistent.

*State v. Juelfs,* 270 N.W.2d 873, 873–74 (Minn.1978).

Leake, however, relies on language in our decision in *State v. Moore,* 438 N.W.2d 101 (Minn.1989) (*Moore I*), to argue that the verdicts in this case are legally inconsistent. In *Moore I* we held that the jury's verdicts finding the defendant guilty of both first- and second-degree murder were not legally inconsistent. 438 N.W.2d at 108. In so holding, we suggested that verdicts are *legally* inconsistent if "a necessary element of each offense * * * was subject to conflicting findings." *Id.*; *see also State v. Netland,* 535 N.W.2d 328, 331 (Minn.1995). Leake argues that in this case the verdicts are legally inconsistent because the element of intent is subject to

---

9. In so doing, we note that in the instant case the sentencing court's reliance on the testimony of the victim of the prior offense in reaching its determination that the crime was committed with "force or violence" was error as it does not meet the requirements of *Blakely,* 542 U.S. at ——, 124 S.Ct. at 2537.

conflicting findings due to the acquittal on the second-degree intentional murder count and the conviction on the first-degree premeditated murder count.[10] Although the language in *Moore I* on its face could support Leake's argument, all of the cases in which this court has applied the *Moore I* rule have involved situations where the defendant alleged inconsistencies between multiple *guilty* verdicts. *See State v. Crowsbreast,* 629 N.W.2d 433, 439–40 (Minn.2001); *State v. Bradford,* 618 N.W.2d 782, 800 (Minn.2000); *State v. Cole,* 542 N.W.2d 43, 50–51 (Minn.1996); *State v. Moore,* 458 N.W.2d 90, 93–95 (Minn.1990) (*Moore II,* unrelated to *Moore I*). For example, in *Moore II,* we held that the verdicts of guilty of first-degree premeditated murder and guilty of second-degree manslaughter were legally inconsistent because the defendant could not have caused the death of his wife with premeditation and intent and at the same time cause her death through negligence or reckless conduct. 458 N.W.2d at 94.

We recognize that the language of *Moore I* does not explicitly limit its holding to situations where a defendant is convicted on multiple counts which contain conflicting elements. Nonetheless, *Moore I* relies on our decision in *Juelfs* which states that a defendant is not entitled to a new trial if the verdicts returned are logically inconsistent. The *Juelfs* rule has consistently been applied by the Minnesota Court of Appeals when a defendant is convicted of one offense and acquitted of an-

other. *See, e.g., State v. Brown,* 455 N.W.2d 65, 70 (Minn.App.), *rev. denied* (Minn. July 6, 1990); *State v. Newman,* 408 N.W.2d 894, 898 (Minn.App.), *rev. denied* (Minn. Aug. 19, 1987); *Nelson v. State,* 407 N.W.2d 729, 731 (Minn.App.), *rev. denied* (Minn. Aug. 12, 1987). Further, the majority of states do not reverse inconsistent verdicts when there is one acquittal and one conviction. *See* W.E. Shipley, Annotation, *Inconsistency of Criminal Verdict as Between Different Counts of Indictment or Information,* 18 A.L.R.3d 259 § 3 at 274 (1968 & Supp. 2004); Eric L. Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts,* 111 Harv. L. Rev. 771, 787 (1998).[11] Because the instant case involves only logical inconsistencies—between a verdict of acquittal on one count and a verdict of guilty on another count—we hold that the verdicts are not legally inconsistent and Leake is not entitled to a new trial.

### IV.

Leake next alleges in his pro se supplemental brief that the prosecutor committed misconduct in the closing argument and that such misconduct requires reversal of his conviction. The statements about which appellant complains include: (1) the prosecutor's statement describing what he imagined Fisher said in her voice mail message to appellant and the conversation between appellant and Fisher on the night of the murder; (2) statements referring to

---

**10.** The elements of first-degree premeditated murder are (1) causing the death of another, (2) with premeditation, and (3) with intent. Minn.Stat. § 609.185(a)(1) (2004). The elements of second-degree intentional murder are (1) causing the death of another (2) with intent. Minn.Stat. § 609.19, subd. 1(1) (2004). The element of premeditation distinguishes first-degree murder from second-degree murder.

**11.** Only a few states continue to require consistency in this situation. *See* Muller, 111 Harv. L. Rev. at 787 & n. 79 (citing cases). Recently, Illinois overruled an earlier decision which required consistency and held that when a defendant is convicted on one count and acquitted on another, consistency is not required. *People v. Jones,* 207 Ill.2d 122, 278 Ill.Dec. 45, 797 N.E.2d 640, 644–49 (2003).

appellant's alleged objectification of women; and (3) the prosecutor's theory that appellant "tortured" Fisher by stabbing the duvet and mattress cover before killing her. Leake did not object to these statements at trial or request cautionary instructions.

When reviewing claims of prosecutorial misconduct arising out of closing arguments, we consider the closing argument as a whole rather than focusing on particular "phrases or remarks that may be taken out of context or given undue prominence." *State v. Walsh,* 495 N.W.2d 602, 607 (Minn.1993). If a defendant fails to object to alleged prosecutorial misconduct at trial or to seek cautionary instructions, we review the defendant's claim to determine if plain error occurred. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998); *see also State v. Parker,* 353 N.W.2d 122, 127 (Minn.1984). Plain error requires: (1) error; (2) that is plain; and (3) that affects substantial rights. *Griller,* 583 N.W.2d at 740. The third prong, requiring that the error affect substantial rights, is satisfied if the error was prejudicial and affected the outcome of the case. *Id.* at 741. We have defined plain error as prejudicial if there is "a reasonable likelihood" that the error "had a significant effect" on the jury's verdict. *Id.* If all three prongs are met, we then assess whether we should address the error to ensure fairness and the integrity of the judicial proceedings. *Id.* at 740.

The first set of statements appellant objects to on appeal concern the early morning phone calls between appellant's and Fisher's phones. Testimony at trial showed that on March 22, 2003, Fisher left appellant a voice mail, that when appellant called her back they talked for three minutes and that appellant blocked his number when he called again later. There is no evidence in the record relating to the substance of either the voice mail or the phone calls. The prosecutor, while speculating as to the substance of these conversations, specifically told the jury that "I can't tell you exactly what it was that she said," but went on to say:

> [W]hatever she said to him, he did not like * * *. We know that because of the way he reacted * * * because * * * he travels all the way from his apartment to Megan's apartment. We know that he has traveled there because the cell tower records indicate[ ] that the call, that 2:45 call, bounces off the tower right next to Megan's apartment.

Later, the prosecutor said:

> Megan called and left [appellant] a message at 1:27 saying "no more." He calls her after getting his voice mail, he calls her at 1:56 and asks her to reconsider. She says no so he shows up at her doorstep at 2:45 and he has to disguise his call so he blocks his cell phone number.

We have previously stated that counsel must not speculate in closing argument about events occurring at the time of the killing absent a factual basis in the record. *State v. Bradford,* 618 N.W.2d 782, 799 (Minn.2000). We conclude that the prosecutor's speculation about the substance of the voice mail message and the conversation between Fisher and Leake was improper. We nonetheless conclude that the prosecutor's statements do not satisfy the third prong of the plain error test—that the error affect substantial rights—because there is no reasonable likelihood that the error had a significant effect on the jury's verdict.

Appellant next objects on appeal to several comments the prosecutor made about appellant's "objectification" of women, which appellant argues were prejudicial:

Couple that with the evidence about this individual's attitudes or perceptions about women.

* * * *

This is not an individual that holds a woman in high esteem. This is an individual that looks at women as objects. So when Megan Fisher tells him no, this is not something that he can handle very well, that he takes easily because this is an object, telling him, a big man, that he can't do something. He's not listening to that, not from a woman. He doesn't take that from a woman.

* * * *

[T]hat conversation was not satisfactory to him, * * * not the way he wanted to treat this object that everyone else called Megan Fisher * * *.

■ While character attacks during closing arguments are improper, *State v. Washington,* 521 N.W.2d 35, 39 (Minn. 1994), parties are permitted to argue reasonable inferences from the facts presented at trial. *State v. Wahlberg,* 296 N.W.2d 408, 419 (Minn.1980). Here, the jury heard testimony that appellant was married and was involved with at least two other women. While the prosecutor's arguments could be interpreted as going beyond the mere facts, we conclude that these comments were not prejudicial and therefore did not affect appellant's substantial rights.

■ The last series of remarks to which appellant objects on appeal relate to the prosecutor's comments regarding testimony at trial that there were rips and tears in Megan's duvet and mattress cover. In closing argument, the prosecutor said:

What he is doing, ladies and gentlemen, is he's playing with Megan Fisher, the way a cat plays with a mouse before that cat kills that mouse. He knows from his conversations that Megan wishes to re-

ject his advances, no longer wants to play booty call with him. He doesn't take rejection real well so as he's holding her down, he is stabbing the bed behind her and he is torturing her.

Even if these statements go beyond arguing reasonable inferences from the testimony at trial, we conclude that they do not satisfy the third prong of the plain error test.

### V.

■ The final issue Leake raises in his pro se supplemental brief relates to alleged inconsistencies between the evidence presented before the grand jury and the evidence produced at trial. Because a presumption of regularity attaches to an indictment, a defendant bears a heavy burden when seeking to overturn an indictment, particularly after the defendant has been found guilty beyond a reasonable doubt. *State v. Lynch,* 590 N.W.2d 75, 79 (Minn.1999). Having carefully reviewed the record, we conclude that Leake has not met this burden.

Affirmed.