Tim A. **TYLER**, Respondent,

v.

**COMMISSIONER OF PUBLIC SAFETY**, Petitioner.

No. C6–84–447.

Supreme Court of Minnesota.

May 24, 1985.

276

Hubert H. Humphrey, III, Atty. Gen., Linda F. Close, James B. Early, Asst. Attys. Gen., St. Paul, for petitioner.

Ronald O.W. Ylitalo, St. Paul, for respondent.

AMDAHL, Chief Justice.

This is a license revocation proceeding under Minn.Stat. § 169.123 (1983), the implied consent law. The driver, Tim A. Tyler, was involved in a serious head-on collision. Because Tyler was intoxicated and because it appeared that the driver of the other car might die, the investigating officer did not give Tyler an implied consent advisory before obtaining Tyler's consent to a blood test. That test showed that Tyler's blood alcohol concentration was .14. Subsequently, the commissioner revoked Tyler's license under Minn.Stat. § 169.123, subd. 4, which authorizes revocation if the driver submits to a test and the test results indicate a blood alcohol concentration of .10 or more. The County Court of Washington County sustained the revocation. The district court appeal panel reversed, holding that the investigating officer did not have probable cause to believe that Tyler had committed the crime of criminal negligence. We granted the commissioner's petition for permission to appeal. The commissioner argues that the investigating officer did have the requisite probable cause. Tyler disagrees and argues that in any event the test results cannot be used to sustain the revocation under the implied consent law. The commissioner in reply argues that Tyler is not free to make the latter argument and that in any event the argument is without merit. We hold that the district court appeal panel erred in concluding that the investigating officer did not have the requisite probable cause. However, because we also hold that the test results cannot be used to sustain the revocation under the implied consent law, we affirm the district court's order, which reversed the order of the county court sustaining the revocation.

The accident was a 2-car head-on collision that occurred at 1:30 a.m. on February 11, 1983, in the southbound lane of Highway 61 just north of County Road 4 in Washington County.[1] Tyler, age 25, of North St. Paul, was the driver and sole occupant of one of the two cars; David Robertson, age 32, of Forest Lake, was the driver and sole occupant of the other car.

State Trooper Craig Bailey was the first trooper on the scene and therefore became the primary investigating officer. State Trooper Everett Hurd, a trained accident reconstruction specialist, arrived a short time later and began taking measurements, making sketches and doing other things involved in a reconstruction of the accident. Both Tyler and Robertson were still inside their respective cars when Bailey arrived. At one point, as paramedics were trying to get Robertson out of his car, one of the paramedics told Bailey that he could not get a heartbeat or detect any breathing. Although the paramedics "brought him back around," Robertson remained unconscious and in "very, very serious" condition. The paramedics kept telling Bailey that they did not think Robertson was going to survive.

There were no eyewitnesses other than Robertson and Tyler, the two drivers. Bailey talked with Tyler after Tyler was removed from his car and was lying on a stretcher. Tyler said he had been at the Legion Club in Forest Lake and was driving southbound on Highway 61 when "all of a sudden" the other car, heading northbound with one headlight out, swerved into his lane. Bailey detected a strong odor of alcohol coming from Tyler, noted that Tyler's eyes were bloodshot and his speech slightly slurred, and observed that Tyler was jittery and shaky. He concluded that Tyler was under the influence of alcohol.

Bailey obtained samples from both Robertson and Tyler before they were removed in a common ambulance. Robertson's

1. The parties proceeded under the law as it existed at the time of the accident. We do not consider the effect, if any, of the 1984 amendments on our decision. *See* Act of May 2, 1984, ch. 622, §§ 7, 10, 1984 Minn.Laws 1541, 1543–44, 1546–47.

blood was later determined to have a blood alcohol concentration of .15, and Tyler's was determined to have a concentration of .14. Bailey testified that at the time he obtained the samples, he did not know which way the respective vehicles had been traveling before the accident. Because he believed that Robertson might well die and because he believed that in that event there was a possibility of Tyler's being charged with criminal negligence, he decided that he was going to obtain a blood sample from Tyler whether or not Tyler consented. Accordingly, he did not read Tyler the standard implied consent advisory. He testified that, after telling Tyler that the other party might die and that they wanted a blood test, he asked Tyler if he would give him one voluntarily and that Tyler consented. Tyler, however, testified that Bailey did not ask him if he would give blood; rather, he testified that while the paramedic was removing his blood he asked Bailey and the paramedic why they were doing it and they said it was to determine his blood alcohol concentration.

On cross-examination of Bailey, Tyler's attorney tried to elicit evidence establishing that Bailey knew before he ordered the blood samples taken that Robertson, not Tyler, caused the accident. Bailey testified, however, that people often lie after accidents and he was not sure Tyler was telling the truth. He testified further that he did not have the benefit of the accident reconstruction because that was not completed until "an hour to two hours after the investigation and the people had already left the scene." He admitted that he had observed the skid marks in the southbound lane but testified that he could not tell which vehicle they belonged to.

Trooper Hurd's reconstruction of the accident, completed (as Trooper Bailey testified) after the drivers had been removed from the scene, indicated to him that Robertson was at fault and failed to indicate that Tyler was at fault.

The record does not indicate whether Tyler was ever charged with either criminal negligence or DWI. In any event, this is a separate civil revocation proceeding under the implied consent law.

The commissioner's attorney argued to the trial court that under our cases Bailey had the requisite probable cause to require Tyler to submit to a test, that under our cases the test results would be admissible in either a criminal negligence or DWI prosecution, and that he believed it was proper to allow the results to serve as the basis for a revocation under the implied consent law. Tyler's attorney focused his argument on the issue of whether Bailey had probable cause to believe that Tyler was guilty of criminal negligence.

The trial court did not make any findings of fact but concluded that the trooper had probable cause to believe that Tyler was driving while under the influence and that he had committed a felony.

In his appeal to the district court appeal panel, Tyler claimed that Bailey did not have probable cause to believe that he had committed the crime of criminal negligence and that in any event the test result could not properly be used to sustain a revocation under the implied consent law. The appeal panel did not reach the second issue because it concluded that Bailey did not have probable cause to believe that Tyler had committed criminal negligence.

■■ 1. At the outset, we emphasize that the probable cause issue is not a constitutional issue. As a matter of federal constitutional law, the warrantless removal of blood for a blood alcohol test is clearly permitted if police have probable cause to believe that the defendant has committed the offense of DWI and that the removal of the blood is necessary to preserve evidence of the defendant's guilt. *South Dakota v. Neville*, 459 U.S. 553, 558–64, 103 S.Ct. 916, 920–23, 74 L.Ed.2d 748 (1983); *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *State v. Aguirre*, 295 N.W.2d 79 (Minn.1980); 2 W. LaFave, Search and Seizure § 5.4(b), n. 19, at 343 (1978 & Supp.1985). Bailey's action in ordering the warrantless removal of blood was therefore justified under the constitution. The more difficult issue is whether

the action was proper under our statutes and our decisions interpreting them.

A useful starting point in examining this issue is *State v. Aguirre*, 295 N.W.2d 79 (Minn.1980). The issue there was whether the chemical analysis of blood removed without a warrant and without consent from an apparently intoxicated but conscious driver, who likely was the cause of a fatal automobile accident, was admissible in a subsequent DWI prosecution. We noted that under Minn.Stat. § 169.121, subd. 2 (1978), the results of a chemical test were admissible in a DWI prosecution if the test was taken "voluntarily or pursuant to section 169.123 [the implied consent law]." *Id.* at 81. We explained that the purpose of the statute was to protect ordinary drivers suspected of DWI from being subjected to nonconsensual removal of blood. *Id.* at 82. Thus, we stated,

> if an officer merely has probable cause to arrest a driver for driving while under the influence or driving with blood alcohol in excess of .10% by weight, the statute does not give the officer any incentive to order a nonconsensual removal of the driver's blood because only blood removed voluntarily or in compliance with the provisions of the implied consent law will be admissible in any subsequent prosecution for driving while under the influence of alcohol or driving with blood alcohol in excess of .10% by weight.

*Id.* at 82. We reaffirmed our holdings in prior cases [2] that the purpose of the statute was not subverted by the admission in a criminal negligence prosecution of chemical analysis of blood even if the blood was not obtained voluntarily or in compliance with the implied consent law, so long as it was not obtained in violation of the constitution. *Id.* at 81–82. We then stated:

> [T]he officer was confronted with a situation in which he had probable cause to believe that defendant driver was not only intoxicated but had just committed

the felony offense of criminal negligence resulting in death, § 609.21 (1978). In such a situation he knew that it was essential that he obtain the blood sample without delay and without regard to whether defendant would consent to the removal of a blood sample. Accordingly, he did not follow the formality of first trying to obtain defendant's consent; instead, he simply ordered the removal of the blood sample, as he had a right to do under the Constitution. Minn.Stat. § 169.121, subd. 2 (1978), was not drafted with this situation in mind, and the officer was not trying to defeat the purpose of that statute. * * * The test results clearly would be admissible in a criminal negligence prosecution. The fact that the grand jury chose not to indict defendant for that offense was a benefit to defendant. Suppressing the evidence and thereby making prosecution of defendant on the less serious misdemeanor charges more difficult would only have the effect of benefiting defendant more without furthering the purpose served by § 169.121, subd. 2, of protecting the ordinary conscious but intoxicated driver from nonconsensual removal of blood.

*Id.* at 82.

Subsequently, in *State v. Speak*, 339 N.W.2d 741 (Minn.1983), a prosecution for criminal negligence, we were faced with the issue of what sort of probable cause is needed in the *Aguirre*-type of case. We stated:

> We believe that the probable cause that is needed—assuming that probable cause is needed—is probable cause to believe that the crime of criminal negligence has been committed and probable cause to believe not that the defendant is intoxicated but that administration of the breath test will result in the discovery of evidence that will aid in the prosecution of that crime. Evidence of a defendant's drinking is but one of many factors that bears on a determination of the issue of

---

**2.** *State v. Dewey*, 272 N.W.2d 355 (Minn.1978); *State v. Capelle*, 285 Minn. 205, 172 N.W.2d 556

(1969).

whether the defendant is guilty of the crime of criminal negligence. As the state points out, ingestion of alcohol in amounts less than those needed to cause gross outward symptoms of intoxication can have a substantial adverse effect on a driver's judgment.

We need not decide whether it is enough to establish probable cause that a driver who smells of alcohol has been involved in a fatal accident. In this case there was more than just a fatal accident and a driver who smelled of alcohol.

*Id.* at 745.

In this case there was evidence that the test was taken voluntarily. Specifically, Trooper Bailey testified that he asked Tyler if he would submit to the test and that Tyler said he would. *State v. Rossow,* 310 Minn. 399, 247 N.W.2d 398 (1976) (upholding a finding, on similar testimony, that the defendant voluntarily consented to testing). However, there was testimony by Tyler to the contrary and the trial court did not resolve the conflict in the testimony.

■■■ We therefore address the issue of whether the facts available to Bailey met the test adopted in *Speak.* We hold that they did. It is true that a fatality had not yet occurred and Bailey could not point to any objective evidence such as skid marks or any information from eyewitnesses to suggest that Tyler caused the accident. On the other hand, he knew that it was a real possibility that Robertson would die, he had evidence that Tyler was intoxicated, and he knew that there had been a head-on collision of two cars. Head-on collisions involving two cars usually do not occur unless at least one of the drivers is negligent. At a minimum, Bailey had a strong reason to believe that a prosecution of Tyler for criminal negligence might result from the accident and to believe that scientific evidence of Tyler's intoxication would be useful in such a prosecution.

2. This case, unlike *Aguirre,* is not a DWI prosecution but a revocation proceeding under the implied consent law. Tyler argued that even if Bailey acted properly, the test results cannot be used to sustain a revocation under the implied consent law because the blood was not removed in compliance with the implied consent law.[3] The commissioner argues that this issue is not properly before this court, but we disagree. The issue was not addressed by the trial court even though the issue was discussed. Tyler raised the issue in his appeal to the district court but the district court did not address it because it ruled in Tyler's favor on the probable cause issue. Because we have ruled against Tyler on the probable cause issue, we address the issue.

■■■ There are two basic ways one's license can be revoked pursuant to the implied consent law: by refusing to take a test that is offered or by submitting to a test, the results of which reveal a blood concentration of .10 or more. Compliance with the procedures of the implied consent law is a prerequisite to revocation pursuant to the implied consent law. It would be improper and unfair to revoke a driver's license for refusing to take a test if an advisory were not given. One could argue, on the other hand, that the failure to give an advisory should not make any difference in a case where the revocation is based on test results showing that the driver had a blood alcohol concentration of .10 or more. The advisory is not designed to persuade a driver not to take a test; rather, it is aimed at letting a driver know the serious consequences of his refusal to take a test. When a driver submits to a test he arguably has no reason to complain about the use of the test results to revoke his license. If he had been given an advisory he would have either taken a test or not taken a test. If he had not taken a test, he would be

---

**3.** As we stated in *Aguirre,* blood is removed in compliance with the implied consent law if "(a) the advisory is read to the driver and he consents to the removal of blood or (b) the removal of blood from the driver is deemed consensual, as where the driver's condition precludes him

from refusing to consent and his consent is implied." *State v. Aguirre,* 295 N.W.2d 79, 82 (Minn.1980). An example of a case in which the removal of blood was deemed consensual is *State, Dept. of Public Safety v. Wiehle,* 287 N.W.2d 416 (Minn.1979).

subject to a longer revocation. By being forced to take a test pursuant to the *Aguirre-Speak* line of cases, he is no worse off than he would be if he had been given a warning and had taken the test. However, we believe that the legislature intended that a driver's license be revoked pursuant to the implied consent law for driving with a blood alcohol concentration of .10 or more only if the provisions of the law were complied with by the police. Here there was no intent to comply, attempt to comply or compliance with the implied consent law. Thus, while the results of the chemical analysis of Tyler's blood could be used in a prosecution of Tyler for DWI, having been legally obtained, the results could not properly serve as the basis of a revocation of his license pursuant to the implied consent law.

Affirmed.

YETKA, Justice (concurring specially).

I concur in the result because I believe there is evidence respondent consented to the test.