*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0210**

Jason Richard Montonye, petitioner,
Appellant,

vs.

Commissioner of Public Safety,
Respondent.

**Filed November 16, 2015
Affirmed
Larkin, Judge**

Grant County District Court
File No. 26-CV-14-155

Samuel J. Edmunds, Sieben Edmunds PLLC, Mendota Heights, Minnesota (for appellant)

Lori Swanson, Attorney General, Frederic J. Argir, Jacob Fischmann, Assistant Attorneys General, St. Paul, Minnesota (for respondent)

Considered and decided by Larkin, Presiding Judge; Bjorkman, Judge; and Minge, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges the revocation of his license to drive under Minnesota's implied-consent law, which stemmed from his arrest for driving while impaired. He argues that the revocation should be rescinded because the arresting officer did not have probable cause to believe he had driven while impaired and because the officer did not comply with the implied-consent law. We affirm.

## FACTS

Respondent Commissioner of Public Safety revoked appellant Jason Richard Montonye's license to drive after he was arrested for driving while impaired and refused to submit to chemical testing under Minnesota's implied-consent law. Even though Montonye refused to provide a sample for chemical testing, the arresting officer obtained two blood samples from him pursuant to a search warrant. Montonye petitioned the district court to rescind the revocation, arguing that the officer improperly invoked the implied-consent law because he did not have probable cause to believe Montonye had driven while impaired and that the officer violated the implied-consent law by obtaining Montonye's blood sample after he refused testing. The district court held an evidentiary hearing, made findings of fact, and sustained the revocation. Montonye appeals.

## DECISION

### I.

Montonye contends that the district court erroneously concluded that the arresting officer had probable cause to believe that he had driven while impaired and to therefore

invoke Minnesota's implied-consent law. Minnesota's implied-consent statute provides that a chemical test "may be required of a person when an officer has probable cause to believe the person was driving, operating, or in physical control of a motor vehicle" while impaired and the person has been lawfully placed under arrest. Minn. Stat. § 169A.51, subd. 1(b), 1(b)(1) (2012).

Probable cause exists when "there are facts and circumstances known to [an] officer which would warrant a prudent man in believing that [an] individual was driving or was operating a motor vehicle on the highway while under the influence of an alcoholic beverage." *State v. Harris*, 295 Minn. 38, 42, 202 N.W.2d 878, 881 (1972). The probable-cause standard is "an objective one that considers the totality of the circumstances." *State v. Olson*, 634 N.W.2d 224, 228 (Minn. App. 2001), *review denied* (Minn. Dec. 11, 2001). Here, neither party challenges the district court's factual findings, so we review the district court's probable-cause determination de novo. *See Shane v. Comm'r of Pub. Safety*, 587 N.W.2d 639, 641 (Minn. 1998) ("When the facts of a case are undisputed, probable cause is a question of law to be reviewed *de novo*.").

An admission of alcohol consumption and the presence of objective indicators of intoxication are generally sufficient to establish probable cause. *See Martin v. Comm'r of Pub. Safety*, 353 N.W.2d 202, 204 (Minn. App. 1984) (noting that "there are numerous signs indicating a person is under the influence of intoxicating liquor, and that an opinion on that condition can be reached without presence of all of the signs"); *cf. Johnson v. Comm'r of Pub. Safety*, 366 N.W.2d 347, 350 (Minn. App. 1985) (finding that probable cause existed to invoke the implied-consent procedure in part because of a driver's

3

admission of driving). A "temporal connection" between the driving and intoxication must be shown to establish probable cause to believe a person was driving a motor vehicle under the influence of alcohol. *Dietrich v. Comm'r of Pub. Safety*, 363 N.W.2d 801, 803 (Minn. App. 1985). However, an officer need not "know the *exact time*" a person was driving or "personally observe the driving or operating of the vehicle." *Delong v. Comm'r of Pub. Safety*, 386 N.W.2d 296, 298 (Minn. App. 1986), *review denied* (Minn. June 13, 1986).

The facts relevant to the probable-cause determination are as follows. At 2:26 a.m., a third party reported that a domestic assault had occurred at the Montonye residence approximately one hour earlier. Officer Dale Haberer and Officer Ken Froemming separately arrived at Montonye's residence. Officer Haberer observed two vehicles, tire marks, and torn up grass in the yard. Officer Froemming also observed the tire marks and torn up grass. Montonye's son stated that Montonye was drunk and that he and Montonye got into a fight. Montonye's son stated that Montonye may have caused the tire marks in the yard. When Officer Haberer mentioned that Montonye's son indicated that Montonye had driven, Montonye "nodded his head in apparent acknowledgement."

In addition, Montonye smelled of alcohol, slurred his speech, and was unsteady on his feet. Montonye stated that he had consumed three drinks and two beers at a graduation party and that he had his last drink at approximately 2:00 a.m. Montonye stated that he was drunk during the fight with his son, that he left afterward for his parents' house in his vehicle but turned around because of low fuel, and that he made the

4

tire marks in the yard because he was frustrated with his son. Officer Froemming administered field sobriety tests to Montonye and observed indicators of intoxication during a horizontal gaze nystagmus (HGN) test. Montonye told Officer Froemming to skip the HGN test because he was intoxicated. Montonye took a preliminary breath test (PBT), which revealed an alcohol concentration of .199.

Montonye concedes that there was probable cause to believe that he was intoxicated when the officers arrived at his residence, but he argues that there was not probable cause to believe that he had driven while impaired. Specifically, he argues that the officers "could not temporally connect the impairment and the driving." We disagree. Montonye admitted that he was drunk during the fight with his son and that he drove from his house after the fight. Based on the third-party report, the officers knew that the fight occurred approximately one hour prior to their arrival. Montonye displayed several signs of intoxication during his encounter with the police. Under the circumstances, there was probable cause to believe that Montonye had driven while impaired.

## II.

Montonye contends that "the district court erred by sustaining [his] license revocation because the officers failed to comply with the implied consent law." His contention raises issues of law that we review de novo. *See Nordvick v. Comm'r of Pub. Safety*, 610 N.W.2d 659, 662 (Minn. App. 2000) ("Legal questions are reviewed de novo on appeal.").

Under Minnesota's implied-consent statute, any person who operates a motor vehicle in Minnesota "consents, subject to the provisions of sections 169A.50 to 169A.53

5

(implied consent law), . . . to a chemical test of that person's blood, breath, or urine for the purpose of determining the presence of alcohol." Minn. Stat. § 169A.51, subd. 1(a) (2012). "If a person refuses to permit a test, then a test must not be given, but the peace officer shall report the refusal to the commissioner . . . ." Minn. Stat. § 169A.52, subd. 1. (2012). If a driver refuses to submit to alcohol-concentration testing upon a law enforcement officer's valid request, the commissioner of public safety must revoke that person's license to drive. Minn. Stat. § 169A.52, subd. 3(a) (2012).

The relevant facts are as follows. Officer Froemming arrested Montonye and transported him to the sheriff's office, where he read Montonye Minnesota's implied-consent advisory and asked him if he would submit to a breath test. Montonye refused. Officer Froemming drafted a search-warrant application to obtain a blood sample from Montonye. Officer Froemming contacted a judge to sign the warrant but could not obtain a copy of the signed warrant due to technical difficulties. The judge eventually gave Officer Froemming "verbal permission to execute the warrant." Officer Froemming transported Montonye to a hospital where a nurse took two samples of his blood with a law-enforcement kit after an initial, unsuccessful attempt to take a sample using another kit.

Montonye argues that his license revocation should be rescinded because law enforcement failed to comply with the portion of the implied-consent statute that states, "If a person refuses to permit a test, then a test must not be given . . . ." Minn. Stat. § 169A.52, subd. 1; *see State v. Scott*, 473 N.W.2d 375, 377 (Minn. App. 1991) ("The implied consent law states in clear and unambiguous language that an officer shall not

6

give a test if the driver refuses to permit one."). He asserts that the government may only revoke a person's license to drive under the implied-consent law if the police comply with the implied-consent law.

Montonye relies primarily on *Scott*. In *Scott*, a driver's blood sample was taken after the driver refused testing, and the issue on appeal was whether the results of the blood test were admissible. 473 N.W.2d at 376. This court concluded that the district court properly suppressed the test results. *Id.* at 378; *see also State v. Aschnewitz*, 483 N.W.2d 107, 108 (Minn. App. 1992) ("In *Scott*, when the accused invoked the right to refuse testing offered through the implied consent advisory, the result from the test taken despite that refusal was not admissible."). Here, the district court followed *Scott* and suppressed the results of Montonye's blood test. *Scott* does not also require rescission of Montonye's license revocation, which was based on his test refusal.

Montonye also relies on cases holding that license revocations were improper because law enforcement did not comply with other requirements related to the implied-consent law. In those cases, procedural irregularities affected the drivers' decisions whether to submit to testing. For example, in *Friedman v. Comm'r of Pub. Safety*, the supreme court reversed a license revocation because the driver's limited right to counsel "before deciding whether to submit to chemical testing" was violated. 473 N.W.2d 828, 835, 837 (Minn. 1991). The supreme court similarly has noted that it is "improper and unfair" to revoke a driver's license based on a person's refusal when law enforcement does not provide an implied-consent advisory because that advisory lets "a driver know the serious consequences of his refusal to take a test." *Tyler v. Comm'r of Pub. Safety*,

7

368 N.W.2d 275, 280 (Minn. 1985); *see also Scott*, 473 N.W.2d at 377 (noting that "the purpose of the implied consent advisory is to inform the driver of the serious consequences of his or her refusal").

*Friedman* and *Tyler* are distinguishable from this case. An officer's failure to provide an implied-consent advisory or to vindicate the right to pretest counsel limits the information that a driver has when deciding whether to submit to chemical testing. The lack of information, in turn, potentially affects the driver's decision whether to submit to chemical testing. However, obtaining a chemical-test sample from a driver pursuant to a search warrant *after* the driver has refused testing cannot and does not affect the driver's decision whether to submit to testing because that decision has already been made. Because Officer Froemming's failure to comply with the implied-consent law in this case did not impact Montonye's decision to refuse testing, we are not persuaded that precedent requires rescission of the refusal-based revocation.

Montonye also argues that "as a deterrent to wrongful police conduct, the exclusionary rule should be applied to prevent a license revocation when law enforcement fails to comply with the implied consent law." The exclusionary rule deters improper police misconduct by excluding evidence obtained as the result of or through constitutional violations. *See Davis v. United States*, 131 S. Ct. 2419, 2423 (2011) (describing the exclusionary rule as "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation"); *see also Mapp v. Ohio*, 367 U.S. 643, 656, 81 S. Ct. 1684, 1692 (1961) ("[T]he purpose of the exclusionary rule is to deter—to compel respect for the constitutional guaranty in the

8

only effectively available way—by removing the incentive to disregard it." (quotation omitted)). The exclusionary rule applies to the "fruit" of the unconstitutional police conduct. *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 416 (1963).

The improper police conduct in this case was obtaining a blood sample for chemical testing, pursuant to a warrant, after Montonye refused to provide a sample under the implied-consent law. Montonye agrees that the police misconduct is not a constitutional violation. Moreover, Montonye's refusal is not the fruit of the police misconduct. Lastly, we are not aware of any precedent supporting Montonye's argument that the exclusionary rule applies to evidence obtained prior to police misconduct. For those reasons, we hold that the exclusionary rule does not apply to evidence of Montonye's test refusal and it does not require rescission of his license revocation.

In conclusion, the district court did not err by affirming the revocation of Montonye's license to drive.

**Affirmed.**