LARKIN, Judge
In this pretrial appeal, the state challenges the district court's order suppressing blood-test results and dismissing driving-while-impaired (DWI) charges. The order was based on the state's failures to provide respondent-driver an opportunity to consult with an attorney before submitting to testing pursuant to a search warrant and to advise respondent-driver that refusal to submit to a blood test is a crime. The district court also reasoned that suppression was required on due-process grounds. Because respondent-driver did not have a right to consult with an attorney, the state's failure to provide the advisory does not justify suppression, and respondent-driver is not entitled to relief under the due-process theory on which *106 the district court relied, we reverse and remand.
FACTS
Appellant State of Minnesota charged respondent Charles Lee Mike with two counts of third-degree DWI under Minn. Stat. § 169A.20, subd. 1(1) (2016) (driving under the influence of alcohol), and Minn. Stat. § 169A.20, subd. 1(5) (2016) (operating a motor vehicle with an alcohol concentration of 0.08 or more as tested within two hours of operating). Mike moved to suppress the evidence supporting the charges, and the district court held an evidentiary hearing on the motion. The relevant facts were developed at the hearing as follows.
On October 7, 2017, at approximately 4:00 p.m., Deputy Troy Nichols of the St. Louis County Sheriff's Department was dispatched to a motorcycle accident in Greenwood Township. At the scene, Deputy Nichols made contact with Mike, who was being treated for injuries inside an ambulance. Mike was transported to a hospital for medical care. Based on his observations and discussions with witnesses, Deputy Nichols believed that Mike was under the influence of alcohol, and he obtained a search warrant authorizing collection of a sample of Mike's blood for chemical testing.
Deputy Nichols executed the search warrant while Mike was at the hospital. When executing the warrant, Deputy Nichols did not inform Mike that refusal to submit to a blood test is a crime. Nor did Deputy Nichols offer Mike an opportunity to consult with an attorney before submitting to the blood test. Hospital staff drew a sample of Mike's blood pursuant to the warrant at approximately 7:20 p.m. Chemical testing revealed that Mike's alcohol concentration was 0.23.
In district court, Mike argued that his blood-test results should be suppressed for two reasons. First, Deputy Nichols did not provide him an opportunity to consult with an attorney before the blood sample was drawn and therefore violated his limited right to counsel under the Minnesota Constitution, as recognized in Friedman v. Comm'r of Pub. Safety , 473 N.W.2d 828, 829 (Minn. 1991). Second, Deputy Nichols did not inform him that refusal to submit to a warranted blood test is a crime, as required by Minn. Stat. § 171.177, subd. 1. The district court agreed and granted Mike's motion to suppress, reasoning that Mike "had a right to consult with counsel" and that Mike "was not adequately informed of his rights." The district court also reasoned that due process required suppression. Having suppressed the blood-test results, the district court dismissed the charges against Mike. The state appeals.
ISSUES
I. Did the district court err by suppressing Mike's blood-test results on the ground that the state did not provide Mike an opportunity to consult with an attorney before submitting to chemical testing?
II. Did the district court err by suppressing Mike's blood-test results on the ground that the state did not inform Mike that refusal to take a warranted blood test is a crime?
III. Did the district court err by suppressing Mike's blood-test results on due-process grounds?
ANALYSIS
The state's ability to appeal in a criminal case is limited. State v. Lugo , 887 N.W.2d 476, 481 (Minn. 2016). The state may generally appeal "from any pretrial order" if the "district court's alleged error, unless reversed, will have a critical impact on the outcome of the trial."
*107 Minn. R. Crim. P. 28.04, subds. 1(1), 2(2)(b). "Dismissal of a complaint satisfies the critical impact requirement." State v. Trei , 624 N.W.2d 595, 597 (Minn. App. 2001), review dismissed (Minn. June 22, 2001). Because the district court dismissed the charges against Mike based on its order suppressing his blood-test results, the critical-impact requirement is satisfied, and we proceed with our review of the district court's suppression order. "When reviewing pretrial orders on motions to suppress evidence, [appellate courts] independently review the facts to determine whether, as a matter of law, the court erred in its ruling." State v. Jackson , 742 N.W.2d 163, 168 (Minn. 2007).
I.
We first consider whether Mike had a limited right to consult with an attorney before submitting to blood testing. In Friedman , the supreme court held that "[t]he Minnesota Constitution, article I, section 6 gives [a driver] a limited right to consult an attorney before deciding whether or not to submit to chemical testing for blood alcohol." 473 N.W.2d at 829. In State v. Hunn , the supreme court clarified that "[o]n a request to consent to urine testing, a driver's limited constitutional right to counsel recognized in Friedman ... is not triggered unless the statutory implied-consent advisory is read." 911 N.W.2d 816, 816-17 (Minn. 2018). The supreme court explained:
The Friedman holding is limited to implied-consent cases because of the unique decision and consequences that come with the reading of the advisory. The legal ramifications of the decision to submit (or not submit) to chemical testing after the advisory reading are significant. Of course, consenting may provide law enforcement with the evidence necessary to secure a conviction. But refusing will automatically result in a mandatory license revocation, and may still result in a criminal DWI conviction. As we have recognized, it may not be clear to a driver faced with the advisory whether the consequences for consenting or refusing will be worse. That unique decision is not present here.
Id. at 819-20 (citations omitted).
The state relies on Hunn , arguing that, because "the implied consent advisory was not read in the present case, the right to counsel [was] not required."
The Hunn opinion was released after the district court filed its suppression order in this case. Thus, the district court did not have the benefit of Hunn when it granted Mike's motion to suppress. But under Hunn , Mike did not suffer a violation of the limited right to counsel recognized in Friedman because he was not read an implied-consent advisory.
Mike disagrees, arguing that " Hunn 's applicability with respect to the constitutional right to counsel is very limited. It only applies to the narrow span of cases that arose between the Birchfield and Trahan decisions and the implementation of the new DWI [laws] in 2017." See Birchfield v. North Dakota , --- U.S. ----, 136 S.Ct. 2160, 195 L.Ed.2d 560 (2016) ; State v. Trahan , 886 N.W.2d 216 (Minn. 2016).We recognize that Hunn is based on a prior version of Minnesota's implied-consent law, 911 N.W.2d at 821, and that significant amendments were made to Minnesota's DWI and implied-consent laws in 2017.[1] However, none of the 2017 changes *108 to Minnesota's DWI and implied-consent laws affect Hunn 's straightforward holding that "a driver's limited constitutional right to counsel ... is not triggered unless the statutory implied-consent advisory is read." Id. at 816. In this case, Mike was not read an implied-consent advisory and therefore was not faced with "the unique decision and consequences that come with the reading of the advisory." Id. at 819-20.
Mike also argues that the Hunn court "concluded that [the] constitutional right to counsel is not triggered unless the implied consent procedure is invoked ." (Emphasis added.) He argues that the 2017 amendments to Minnesota's DWI and implied-consent laws "effectively created a situation where the 'Implied Consent Law' is de facto invoked every time a search warrant for a blood or urine sample is executed during a DWI investigation."
As to this issue, word choice matters. Hunn specifically held that the Friedman right to counsel is "not triggered unless the statutory implied-consent advisory is read ." Id. at 816-17 (emphasis added). The supreme court consistently used a form of the verb "read" to describe-and limit-the circumstances that trigger a driver's limited constitutional right to counsel. See, e.g. , id. ("[A] driver's limited constitutional right to counsel recognized in Friedman ... is not triggered unless the statutory implied-consent advisory is read."); id. at 819-20 ("The Friedman holding is limited to implied-consent cases because of the unique decision and consequences that come with the reading of the advisory."); id. at 820 ("Accordingly, we hold that the limited right to counsel recognized by Friedman is triggered only when the implied-consent advisory is read."); id. ("Because the officer did not read the implied-consent advisory here, under Friedman the limited right to counsel was not triggered."). In fact, the supreme court did not use a single form of the verb "invoke" in the Hunn opinion.
We therefore reject Mike's argument that the Friedman right to counsel is triggered any time the implied-consent procedure is "invoked." As explained in Hunn , the reading of the implied-consent advisory puts a driver in the position of having to make a unique decision that justifies the limited right to counsel recognized in Friedman . A driver is not put in that position if the police somehow "invoke" the implied-consent law without actually reading the driver an implied-consent advisory.
In sum, because Deputy Nichols did not read Mike an implied-consent advisory, the limited right to counsel recognized in Friedman was not triggered. The district court therefore erred by suppressing Mike's blood-test results on the ground that the state did not provide Mike an opportunity to consult with an attorney before submitting to chemical testing.
II.
We next consider whether the state's failure to comply with the advisory requirement in section 171.177, subdivision 1, justifies suppression of Mike's test results.
We begin with an overview of the relevant statutory scheme, because it provides useful context. Chapter 169A is entitled "Driving While Impaired" and comprises several distinct groups of statutes. General *109 provisions are found in sections 169A.01 to 169A.095 (2016 & Supp. 2017). Criminal provisions are found in sections 169A.20 to 169A.37 (2016 & Supp. 2017). Section 169A.20 (2016 & Supp. 2017) specifically defines the offense of driving while impaired, including the offense of refusal to submit to a chemical test.
Procedural provisions are found in sections 169A.40 to 169A.48 (2016), administrative provisions are found in sections 169A.50 to 169A.63 (2016 & Supp. 2017), and miscellaneous provisions are found in 169A.70 to 169A.78 (2016). Sections 169A.50 to 169A.53 (2016 & Supp. 2017) are expressly identified in section 169A.50 (2016) as "the Implied Consent Law." Section 169A.51, subdivision 3, provides that "a blood or urine test may be conducted only pursuant to a search warrant" and that such tests "may be conducted only as provided in [warrant-execution statutes and section] 171.177."
Chapter 171 is entitled "Drivers' Licenses and Training Schools." That chapter contains the statute at issue here, the "Search warrant-required testing advisory." Minn. Stat. § 171.177, subd. 1. This statute requires that "[a]t the time a blood or urine test is directed pursuant to a search warrant under sections 626.04 to 626.18, the person must be informed that refusal to submit to a blood or urine test is a crime." Id. It is undisputed that Deputy Nichols did not provide this advisory when he directed Mike's blood test.
The state contends that the district court erred by suppressing Mike's test results based on noncompliance with section 171.177, subdivision 1, generally arguing that "[b]lood draws taken pursuant to a search warrant in a criminal case do not require compliance with the administrative procedures [prescribed] in the implied consent statute." Specifically, the state argues, "Law enforcement is not required to follow [ section 171.177 ] if there is no implied consent advisory read." The state reasons that section 171.177"was enacted to cover search warrants obtained to get evidence of impairment for purposes of license revocation" and that it "does not pertain to how evidence is obtained through a search warrant in criminal prosecutions when the implied consent advisory is not read." The state concludes that, because this is a criminal case and not a license-revocation case, it was unnecessary to comply with the advisory requirement in section 171.177, subdivision 1, and that it is therefore unnecessary to determine whether noncompliance justifies suppression of the test results. We address each of the state's conclusions in turn.
Statutory Compliance
The state's proposition that compliance with section 171.177, subdivision 1, was not required in this case raises an issue of statutory interpretation. Statutory interpretation is a question of law that we review de novo. Barrow v. State , 862 N.W.2d 686, 689 (Minn. 2015). When interpreting statutes, our goal is to effectuate the intent of the legislature. In re Welfare of J.B. , 782 N.W.2d 535, 539 (Minn. 2010). If a statute is unambiguous, we must apply its plain meaning without resorting to canons of statutory construction. State v. Hayes , 826 N.W.2d 799, 804 (Minn. 2013). "Multiple parts of a statute may be read together so as to ascertain whether the statute is ambiguous." Christianson v. Henke , 831 N.W.2d 532, 537 (Minn. 2013).
On one hand, the location of section 171.177 in a chapter of the Minnesota Statutes regarding driver's license revocations could suggest that its application is limited to that context. See State v. Struzyk , 869 N.W.2d 280, 287 (Minn. 2015) (stating that appellate courts "read and construe a statute as a whole and interpret each section in light of the surrounding sections");
*110 Minn. Transitions Charter Sch. v. Comm'r of Minn. Dep't of Educ. , 844 N.W.2d 223, 228 (Minn. App. 2014) (stating that a court "must ... review related statutes to determine the meaning of [a] provision within the entire statutory scheme"), review denied (Minn. May 28, 2014).
On the other hand, section 171.177, subdivision 1, does not on its face limit its application to the license-revocation context. It clearly mandates provision of the advisory "[a]t the time a blood or urine test is directed pursuant to a search warrant under sections 626.04 to 626.18," without listing any exceptions to its directive. Moreover, the criminal DWI statute incorporates section 171.177 by reference, providing that "[i]t is a crime for any person to refuse to submit to a chemical test ... of the person's blood or urine as required by a search warrant under section[ ] 171.177." Minn. Stat. § 169A.20, subd. 2(2) (Supp. 2017). This incorporation suggests that compliance with section 171.177, subdivision 1, is necessary in a criminal DWI prosecution based on test refusal.[2]
Because the plain language of section 171.177, subdivision 1, does not provide any exception to its application, and section 171.177 is expressly incorporated into one of the criminal provisions of chapter 169A, we conclude that section 171.177, subdivision 1, is unambiguous and that Deputy Nichols was required to inform Mike that refusal to submit to a warranted blood or urine test is a crime.[3]
Suppression Remedy for Statutory Violation
Having concluded that compliance with the advisory requirement in section 171.177, subdivision 1, was necessary, we must next determine whether suppression of Mike's test results is an appropriate remedy for noncompliance.
"The purpose of suppression is not to vindicate a defendant's rights nor to affirm the integrity of the courts, but to deter police from engaging in illegal searches." State v. Cook , 498 N.W.2d 17, 20 (Minn. 1993). "In other words, the risk of having seized evidence suppressed is intended to persuade police officers to follow the rules and to act lawfully when searching and seizing private property." Id. The supreme court "[has]indicated in a number of cases ... that [it] will not require suppression of all evidence seized in searches constituting, or resulting from, a violation of a statute." State v. Smith , 367 N.W.2d 497, 504 (Minn. 1985).Suppression of evidence obtained in violation of a statute or rule is not required if "the violation is merely technical and did not subvert the basic purpose of the statute." Jackson , 742 N.W.2d at 168. But "serious violations *111 which subvert the purpose of established procedures will justify suppression." Id.
For example, in Smith , the supreme court held that even if the state had violated the Minnesota Government Practices Act by obtaining the defendant's address from a social-services agency, the violation did not require suppression of evidence obtained as a result. 367 N.W.2d at 503-04. The supreme court reasoned that the main purpose of the act's prohibition on unauthorized disclosure of private data was to protect an individual from the disclosure of information identifying him as a welfare-benefits recipient and other information the recipient has a legitimate interest in keeping private. Id. at 504 n.1. The supreme court concluded that any violation of the act in Smith "was a technical violation which did not subvert the basic purpose of the statute" and therefore did not justify suppression. Id. at 504-05.
But in State v. Cook , the supreme court held that "[s]ubstantial violations of the procedural rule followed by [the] court for obtaining a telephone search warrant require[d] ... suppression of the evidence seized in the search." 498 N.W.2d at 18. The supreme court noted that at the time, " Fed.R.Crim.P. 41(c)(2)... was the procedure to be followed in obtaining a search warrant by telephone" and explained that the purpose of the procedures in that rule was to make a record
contemporaneously with the authorization of the search warrant that will show both probable cause for a search and a reasonable need for the warrant to be issued telephonically, so that later, if need be, there is a basis for challenging the warrant that is not dependent solely on after-the-fact recollections. In addition, the federal rule procedures ensure that the police officers will actually have a warrant to carry with them and to display when they execute the search.
Id. at 19-20 (citations omitted).Because the purpose of the rule was undermined by the state's complete failure to make a contemporaneous record regarding the telephonic search warrant in Cook , the supreme court concluded that suppression was appropriate. Id. at 21-22.
The supreme court also concluded that suppression was appropriate in State v. Jackson and State v. Jordan , based on the state's failure to comply with Minn. Stat. § 626.14 (2006), which restricts execution of a search warrant between the hours of 8:00 p.m. and 7:00 a.m. Jackson , 742 N.W.2d at 167-69, 174 ; State v. Jordan , 742 N.W.2d 149, 153-54 (Minn. 2007). The supreme court noted that the general purpose of section 626.14 is "to prevent police intrusion into the personal and private activities of individuals in their homes at night unless the police articulate facts sufficient to support their intrusion." Jackson , 742 N.W.2d at 173 ; Jordan , 742 N.W.2d at 154. The supreme court concluded that because law enforcement did not know whether the defendant in each case "had ... entered a period of nighttime repose," the statutory violations undermined the purpose of the statute and justified suppression. Jackson , 742 N.W.2d at 165, 173 ; Jordan , 742 N.W.2d at 151, 153.
In sum, violation of a statute or rule does not require suppression of evidence obtained as a result of the violation unless the violation undermines the purpose of the statute or rule. Here, Mike argues, "These test results were not 'legally obtained,' in that law enforcement failed to follow the plain dictates of Minnesota statutes and the district court correctly determined that these results cannot be used ... at trial." Thus, the issue of whether suppression is an appropriate remedy for the state's failure to comply with the advisory directive in section 171.177, subdivision 1, is squarely before us. Nonetheless, *112 neither the parties nor the district court discussed Minnesota's law regarding suppression as a remedy for a statutory violation.[4] Mike therefore argues that it is inappropriate for this court to consider that law in its analysis.
In State v. Hannuksela , the Minnesota Supreme Court explained the circumstances in which it is appropriate for an appellate court to rely on law that the parties did not address in their briefs or at oral argument. 452 N.W.2d 668, 673 n.7 (Minn. 1990). In Hannuksela , the supreme court concluded that a search warrant was partially invalid because it lacked specificity. Id. at 673. In the context of deciding the extent to which evidence seized pursuant to the warrant should be suppressed, the supreme court relied on the severance doctrine,[5] even though neither party had addressed the doctrine in their arguments to the court. Id. at 673 & n.7, 674. The supreme court justified its approach as follows:
Neither party discussed the applicability of the law of "severance" or "partial invalidity" in either briefs or at oral argument. If the doctrine were either novel or questionable, it might be appropriate for the court to solicit additional briefs. However, it is the responsibility of appellate courts to decide cases in accordance with law, and that responsibility is not to be diluted by counsel's oversights, lack of research, failure to specify issues or to cite relevant authorities. The doctrine of "severance," or "partial invalidity" has been applied by the 1st, 3rd, 5th, 6th and 8th United States Circuit Courts of Appeals. It is neither new to this court nor questionable. In other relevant decisions, we, in effect, have relied upon "severability." ... [T]he doctrine is not of questionable validity .... Therefore, we proceed to consider its application in this case notwithstanding that the parties failed to raise or discuss the issue in their briefs or at oral argument.
Id. at 673 n.7 (quotations and citations omitted).
Minnesota's law regarding suppression of evidence based on a statutory or rule violation is well-established. This law is neither novel nor of questionable validity, and it is obviously applicable to the suppression issue before us. We therefore decide the issue in accordance with this law, as is our responsibility as an appellate court.
Once again, suppression based on a statutory violation is justified only if the violation subverts the purpose of the statute. We therefore consider the purpose of section 171.177, subdivision 1. Two cases inform our consideration. The first is Tyler v. Comm'r of Pub. Safety , 368 N.W.2d 275 (Minn. 1985). In Tyler , the supreme court considered, in the context of a license-revocation proceeding, the appropriate remedy for the state's failure to provide a standard implied-consent advisory before obtaining a driver's consent to testing. 368 N.W.2d at 278, 280-81. The supreme court stated that "[i]t would be improper and unfair to revoke a driver's license for refusing to take a test if an advisory were not given," but that "failure to give an advisory should not make any difference in a case where the revocation is based on test results showing that the driver had an [illegal] blood alcohol concentration."
*113 Id. at 280. The supreme court reasoned, "The advisory is not designed to persuade a driver not to take a test; rather it is aimed at letting a driver know the serious consequences of his refusal to take a test." Id. (emphasis added).
The second case is State v. Scott , in which this court explained:
[T]he purpose of the implied consent advisory is to inform the driver of the serious consequences of his or her refusal. The onerous civil consequence of license revocation is designed to induce the driver to submit to testing. The minimum one-year revocation for refusal under the implied consent statute is hardly a "safe harbor," free of adverse consequences. When compared to the 90-day minimum revocation for taking but failing the test, the civil consequences strongly compel the driver to take the test.
473 N.W.2d 375, 377 (Minn. App. 1991) (citations and quotations omitted).
In sum, caselaw indicates that the purpose of an implied-consent advisory regarding refusal to submit to chemical testing is to inform a driver of the serious consequences of refusal in an effort to compel the driver to take the test.
Although Mike does not address Minnesota law regarding suppression of evidence based on a statutory violation, he asserts that the purpose of the advisory in section 171.177 is to inform a driver that he may refuse the test, even though there is a warrant compelling the test. Mike argues that although "drivers are told 'refusal to take a test is a crime' and not 'you can refuse to submit to testing in exchange for additional criminal charges' either statement operates as an affirmation that the ability to refuse exists, regardless of the presence of a warrant."
Although the advisory in section 171.177, subdivision 1, indirectly communicates that refusal is an option, we disagree that this is the purpose of the advisory. The legislature chose an advisory that explicitly focuses on only one aspect of warranted blood or urine testing-the criminal consequences of refusal-without addressing other aspects such as the option to refuse. Compare Minn. Stat. § 171.177, subd. 1 (requiring advisory only that refusal to submit to test is a crime), with Minn. Stat. § 169A.51, subd. 2 (requiring advisory that Minnesota law requires breath test, refusal to submit to test is a crime, and test subject has limited right to consult an attorney). This singular, express focus leads us to conclude that the purpose of section 171.177, subdivision 1, is consistent with the purpose of the implied-consent advisories in Tyler and Scott : to inform a driver of the serious consequences of refusal in an effort to compel the driver to take the test.
Because the purpose of the advisory in section 171.177, subdivision 1, is to encourage submission to testing, and not refusal, that purpose is not subverted if a driver submits to a test without being read the advisory. And because the statutory purpose is not subverted in such circumstances, failure to provide the advisory does not justify suppression of ensuing test results. We therefore hold that failure to comply with the advisory requirement in Minnesota Statutes section 171.177, subdivision 1, does not justify suppression of the test results in a criminal prosecution for DWI.[6] The district court therefore *114 erred by suppressing Mike's blood-test results on the ground that the state failed to inform Mike that refusal to take a warranted blood test is a crime.
III.
Lastly, we address the district court's apparent reliance on due process as a ground for suppression. The district court reasoned that "[e]vidence secured in violation of a defendant's right to due process is subject to 'total exclusion' by the courts," citing State v. Stumpf , 481 N.W.2d 887, 890 (Minn. App. 1992). Stumpf involved an application of the due-process holding of McDonnell v. Comm'r of Pub. Safety , 473 N.W.2d 848 (Minn. 1991). 481 N.W.2d at 890. Thus, by relying on Stumpf , the district court essentially relied on the due-process holding of McDonnell in suppressing Mike's test results.
In McDonnell , the Minnesota Supreme Court concluded that Minn.Stat. § 169.123, subd. 2(b)(2) (1990), which required a law-enforcement officer to advise a person subject to testing under the implied-consent law that the person may be subject to criminal penalties if testing is refused, violated the due-process rights of a driver because she did not have a prior driver's license revocation and the criminal test-refusal statute then in effect applied only to drivers who had prior license revocations. 473 N.W.2d at 849-51, 853-55. In Johnson v. Comm'r of Pub. Safety , the supreme court clarified that McDonnell relied on three key elements in holding that a due-process violation occurred: (1) the person whose license was revoked submitted to a breath, blood, or urine test; (2) the person prejudicially relied on the implied-consent advisory in deciding to undergo testing; and (3) the implied-consent advisory did not accurately inform the person of the legal consequences of refusing to submit to the testing. 911 N.W.2d 506, 508-09 (Minn. 2018). Johnson establishes that McDonnell is not a basis for relief in this case because Mike did not prejudicially rely on an inaccurate implied-consent advisory regarding the consequences of test refusal.
Nonetheless, Mike contends that he is entitled to relief under McDonnell because the failure to provide an advisory in this case is comparable to the inaccurate advisory in McDonnell . As support, Mike argues that he might have refused to submit to testing if he had been informed that refusal to submit is a crime. This argument is illogical and unpersuasive, and it does not establish the prejudicial reliance necessary to obtain due-process relief under McDonnell . See id. Because Mike did not prejudicially rely on an inaccurate implied-consent advisory regarding the consequences of test refusal, the district court erred by suppressing Mike's test results on due-process grounds under McDonnell .
DECISION
Because Mike was not read an implied-consent advisory, the limited right to counsel recognized in Friedman was not triggered in this case. Moreover, the state's failure to advise Mike that refusal to submit *115 to a warranted blood test is a crime does not justify suppression of Mike's test results. Lastly, Mike is not entitled to relief under the due-process holding of McDonnell . Thus, the district court erred in suppressing Mike's test results. We therefore reverse the district court's order for suppression and dismissal, and we remand for further proceedings.
Reversed and remanded.

For example, the 2014 version of the implied-consent advisory applicable in Hunn was eliminated by the 2017 amendments. Minnesota's current implied-consent law sets forth an advisory that applies only to breath tests. Minn. Stat. § 169A.51, subd. 2 (Supp. 2017). It recognizes that generally, a warrant must be obtained to conduct a blood or urine test, and it requires recitation of an advisory specific to such tests. Id. , subd. 3 (Supp. 2017); see Minn. Stat. § 171.177, subd. 1 ("At the time a blood or urine test is directed pursuant to a search warrant ..., the person must be informed that refusal to submit to a blood or urine test is a crime."). Because the issue is not before us, we do not determine whether recitation of the advisory regarding blood or urine tests triggers the limited right to counsel recognized in Friedman .

Because the issue is not before us, we do not determine whether a charge of DWI test refusal under section 169A.20, subdivision 2(2), requires compliance with the advisory requirement in section 171.177, subdivision 1.

We also note the following practical difficulty that would arise if the advisory requirement in section 171.177, subdivision 1, were read as applying only in the license-revocation context, as the state urges. Once again, the advisory must be given "[a]t the time a blood or urine test is directed." Minn. Stat. § 171.177, subd. 1. But a license-revocation proceeding begins after test refusal or failure. See Gray v. Comm'r of Pub. Safety , 918 N.W.2d 220, 221, 2018 WL 3716262 at *1 (Minn. App. Aug. 6, 2018) ("After the criminal portion of a DWI arrest-the traffic stop, field sobriety tests, and chemical test-the civil proceeding generally begins with a notice and order of driver's license revocation."). Thus, the state's proposal that reading of the advisory is necessary only in the implied-consent context results in an impractical situation in which a decision regarding whether the advisory must be given depends on a circumstance that has not yet occurred: initiation of a license-revocation proceeding.

The attorneys were invited to address Minnesota's jurisprudence regarding this issue at oral argument to this court.

"Under the severance doctrine, the insufficient portions of [a] warrant are stricken and any evidence seized pursuant thereto is suppressed, but the remainder of the warrant is still valid." Id.

Mike argues that our holding will effectively authorize, in violation of statute, forced blood draws for the purpose of chemical testing. See Minn. Stat. § 171.177, subd. 13 (Supp. 2017) (providing that "[i]f a person refuses to permit a blood or urine test as required by a search warrant and the provisions of [section 171.177 ], then a test must not be given" except in circumstances not applicable here). The rule of law announced in this case does not mean that law-enforcement officers may force an individual to submit to chemical testing. This case does not involve failure to comply with a statutory prohibition of forced blood draws. We therefore do not decide whether such a statutory violation justifies suppression of evidence obtained as a result. If and when we are presented with that issue, we will consider the purpose of the statutory prohibition in deciding whether a violation justifies suppression.